UNITED STATES of America, Plaintiff,

v.

TRACINDA INVESTMENT CORPORATION and Kirk Kerkorian, Defendants.

No. CV 79–0174–AAH (SX).

United States District Court, C. D. California.

Sept. 14, 1979.

corporation, the stock of which is owned entirely by defendant Kirk Kerkorian [hereinafter "Kerkorian"] with Kerkorian serving as its only Director. Kerkorian owns approximately 6% of the outstanding common stock of Metro-Goldwyn-Mayer, Inc. [hereinafter MGM]. Tracinda owns approximately 42% of MGM's common stock. Thus, Kerkorian, individually, and through Tracinda, owns approximately 48% of MGM's common stock and is its controlling shareholder.

As of November 17, 1978, Kerkorian owned 490,700 shares of the common stock of Columbia Pictures Industries, Inc., [hereinafter "Columbia"], representing approximately five percent (5%) of Columbia's outstanding common stock. On or about December 26, 1978, Tracinda commenced a tender offer for approximately 1,750,000 shares of the common stock of Columbia, representing approximately nineteen percent (19%) of Columbia's outstanding common stock. Tracinda's tender offer for Columbia stock was consummated on or about January 16, 1979. As a result of the tender offer and subsequent purchases, Kerkorian individually and through Tracinda now owns 2,438,700 shares of Columbia's common stock, representing approximately twenty-five percent (25%) of Columbia's outstanding common stock.

In January, 1979, plaintiff had originally sought a Temporary Restraining Order staying the Tracinda tender offer, alleging violation of Section 7 of the Clayton Act. 15 U.S.C. § 18.[1] This Court denied that application for Temporary Restraining Or-

Alan L. Marx, Dennis C. Cuneo, Washington, D. C., Robert J. Rose, and Leon W. Weidman, Los Angeles Field Office of the Antitrust Division, U. S. Dept. of Justice, Los Angeles, Cal., for plaintiff.

Wyman, Bautzer, Rothman & Kuchel by Frank Rothman, Terry Christensen, Los Angeles, Cal., and George Miron, Washington, D. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER OF JUDGMENT FOR DEFENDANTS

HAUK, District Judge.

Defendant Tracinda Investment Corporation [hereinafter "Tracinda"] is a Nevada

---

1. 15 U.S.C. § 18 in pertinent part provides:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

der and Motion for Preliminary Injunction,[2] but allowed plaintiff leave to amend its complaint to seek divestiture of the Columbia stock held by Tracinda. Plaintiff did amend its complaint to seek divestiture, still basing this action upon an alleged violation of Section 7 of the Clayton Act.

Court trial in this action commenced on August 1, 1979, and ended August 14, 1979. Having heard the testimony of the witnesses, having read the pleadings and all relevant papers in support of and in opposition to this action, having reviewed the evidence presented in this action and having heard from counsel for plaintiff and counsel for defendants, this court now enters its Memorandum of Decision and Order for Judgment, which shall constitute its findings of fact and conclusions of law herein pursuant to Rule 52(a), F.R.Civ.P.

## NON–CORPORATE DEFENDANT

■ Plaintiff's First Amended Complaint names as defendants herein Tracinda and Kerkorian. The prayer of that complaint asks this Court to adjudge the acquisition of Columbia stock by Kerkorian *and* Tracinda to be in violation of Section 7 of the Clayton Act and to order Kerkorian *and* Tracinda to divest themselves of *their* stock in Columbia. Since Section 7 of the Clayton Act only extends to acquisitions made by corporations, *Hudson Valley Asbestos Corporation v. Tougher Heating & Plumbing Co., Inc.,* 510 F.2d 1140, 1145 (2d Cir. 1975); *GAF Corporation v. Circle Floor Co.,* 329 F.Supp. 823, 829 (S.D.N.Y.1971), *aff'd* 463 F.2d 752 (2d Cir. 1972), *cert. dismissed* 413

U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973), the first question to be confronted by this Court is whether plaintiff may properly seek divestiture under Section 7 of the Clayton Act of the Columbia stock personally purchased and owned by Kerkorian.

■ A corporation may be found to be in violation of Section 7 where the stockholders made purchases on behalf of the corporation. *GAF Corporation v. Circus Floor Co., supra.* This case, however, does not present such a situation. Plaintiff did not allege, nor was there any evidence presented, that Kerkorian acquired any Columbia stock on behalf of Tracinda or any other corporation or that his personal acquisitions are otherwise attributable to Tracinda or any other corporation. Moreover, in its complaint, plaintiff only alleges the 19% acquisition by Tracinda to be a violation of Section 7 and is silent in this respect upon the acquisitions by Kerkorian.[3] Accordingly, plaintiff has not stated sufficient facts, nor presented evidence, upon which relief may be granted against defendant Kerkorian and, in respect to this defendant, the complaint is hereby dismissed for lack of jurisdiction. Thus this action may be properly maintained only for divestiture of the 19% of Columbia stock acquired by Tracinda.

Even if the personal acquisitions by Kerkorian were properly before this Court, since each of the findings of fact and conclusions of law reached by this Court and contained herein apply equally to Tracinda *and* to Kerkorian, this Court must neverthe-

---

**2.** *United States v. Tracinda Inv. Corp.,* 464 F.Supp. 660 (C.D.Cal.1979).

**3.** The Government's First Amended Complaint provides in pertinent part:
"V.
*VIOLATION ALLEGED*
17. The effect of the acquisition alleged in paragraph 6 may be substantially to lessen competition or to tend to create a monopoly in the aforesaid interstate trade and commerce in violation of Section 7 of the Clayton Act in the following ways, among others:
a. Actual and potential competition between MGM and Columbia will be substantially lessened; and

b. Concentration will be increased to the detriment of actual and potential competition."
Paragraph 6 alleges:
"6. On or about December 26, 1978, defendant Tracinda began its tender offer for approximately 1,750,000 shares of the common stock of Columbia Pictures Industries, Inc. (hereinafter referred to as 'Columbia'), representing approximately 19% of Columbia's outstanding common stock. The tender offer is scheduled to be consummated on or about January 16, 1979."

less order judgment in favor of Kerkorian as well as Tracinda. Thus the findings and conclusions set forth below apply and cover both defendants in this action.

## INVESTMENT EXEMPTION

■ Section 7 of the Clayton Act does not condemn every acquisition that may result in the prohibited anticompetitive consequences. An acquisition may escape a challenge under Section 7, even though it may be in violation of the section's substantive provisions, if it falls within the specific exemptions provided for in Section 7, one of which provides that acquisitions of stock where the acquisition is made solely for purposes of investment are not included in the prohibition of Section 7.[4] 2 Von Kalinowski, Antitrust Laws and Trade Regulations § 15.03. Furthermore, it is necessary to make a clear distinction between an exemption and a defense. 7 Von Kalinowski, *supra.*, § 44.01(2). Some courts have made this distinction, noting that this provision constitutes an exemption rather than a defense, *United States v. du Pont & Co.,* 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); *Anaconda Co. v. Crane Co.,* 411 F.Supp. 1210, 1218 (S.D.N.Y.1975), while another Court has failed to make this distinction, *Gulf & Western Indus., Inc. v. Great A. & P. Tea Co., Inc.,* 476 F.2d 687, 693 (2d Cir. 1973). In view of the specific language of this section it would appear that the former cases are correct.

■ Once a defendant has demonstrated to the Court that a stock purchase was solely for investment, then the burden is upon the plaintiff to prove that the defendant is not covered by the investment exemption. As stated in *Anaconda Co. v. Crane Co.,* 411 F.Supp. 1210, 1219 (S.D.N.Y. 1975):

> In cases where the "solely for investment" exemption does not apply, a plaintiff need only show a reasonable probability of a lessening of competition. . .

Thus the anti-competitive effects may be attacked in their incipiency. The statutory exemption, however, conspicuously omits this language. Once it is established to the satisfaction of the Court that the acquisition is "solely for investment," the statute requires a showing that the defendant is "using the [stock] by voting or otherwise to bring about or in attempting to bring about, the substantial lessening of competition . . ."

Thus, whenever the pleadings of the parties and the evidence adduced at trial in a Section 7 action bring forth facts which reasonably support a determination that the purchase of stock was "solely for investment," then this exemption issue must be addressed by the Court, regardless of whether it has been raised as an affirmative defense by defendants.

Here plaintiff submitted as Exhibit 262, the "Stockholders' Agreement"—a contract entered into by Kerkorian and Tracinda, and by Columbia, at the time the tender offer was extended. This contract specifically recites that the acquisition of Columbia stock was "solely for investment" and "not with a view to exercising control over the Company" [Columbia]. This contract also limits the extent to which Kerkorian may utilize the newly acquired stock, specifically providing that in a shareholders vote for directors, Kerkorian shall vote his stock in favor of the nominees for election of directors as proposed by the management of Columbia, and shall cast this vote proportionately to the other shares present at the meeting and voting in favor of such nominees. Additionally, the contract places a limit on Tracinda and Kerkorian's Columbia stock ownership at 25.5%. Accordingly, this contract in and of itself raises the issue of the investment exemption in the first sentence of the third paragraph of Section 7 of the Clayton Act, which the Court is then required to determine at the onset, before it

---

4. 15 U.S.C. § 18 in pertinent part provides in the first sentence of paragraph three thereof:
 This section shall not apply to corporations purchasing such stock solely for investment

and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition.

takes up or engages in any meaningful examination of the substantive prohibitions contained in the first and second paragraphs of Section 7.

■ In discussing this investment exemption, the cases have not specifically used any particular approach. The statute and the cases, however, do support a 2-pronged test: (1) a factual determination of whether the acquisition was made solely for investment; and (2) a factual determination of whether the stock is being used by voting or otherwise to bring about or attempt to bring about a substantial lessening of competition. *United States v. du Pont & Co.,* supra; *Pennsylvania R. Co. v. Interstate Commerce Commission,* 66 F.2d 37, 39–40 (3d Cir. 1933) *aff'd per curiam,* 291 U.S. 651, 54 S.Ct. 559, 78 L.Ed. 1045 (1934); *Swift & Co. v. Federal Trade Commission,* 8 F.2d 595, 599 (7th Cir. 1925); *Anaconda Co. v. Crane Co., supra,* at 1218–1219; *Hamilton Watch Co. v. Benrus Watch Co.,* 114 F.Supp. 307, 314 (D.Conn.1953).

Before the Court can make a determination of whether the stock acquisition here was made solely for the purpose of investment, it is necessary to determine what is meant by the term "investment" as used in the context of Section 7. In one case it was noted that the word "investment" is one of broad application, including in its various uses purchases of practically every kind and description and for every purpose. It ordinarily signifies the use of money to purchase property, personal or real, for any purpose from which income or profit is expected, presently or in the future, speculatively or permanently.[5] *Pennsylvania R.*

*Co., v. Interstate Commerce Commission, supra,* at 39. The factors courts have viewed to make this factual determination are as varied as the extent of human endeavor. Courts have looked at such factors as subsequent agreements restricting the use of the newly acquired stock, *Anaconda Co. v. Crane Co., supra,* at 1218; and the extent to which the defendant already maintains a diversified investment portfolio as well as the price paid for the stock in comparison to the market value of the stock. *Hamilton Watch Co. v. Benrus Watch Co.,* 114 F.Supp. 307, 316 (D.Conn. 1953). The ultimate definitive factor the courts have looked to, however, is whether the stock was purchased for the purpose of taking over the active management and control of the acquired company.[6] *Anaconda Co. v. Crane Co., supra,* at 1218–19; *Hamilton Watch Co. v. Benrus Watch Co., supra,* at 316; *United States v. Wilson Sporting Goods Co.,* 288 F.Supp. 543, 556 (N.D.Ill.1968); *Gulf & Western Indus., Inc. v. Great A. & P. Tea Co., Inc., supra,* at 674; *Swift & Co. v. Federal Trade Commission, supra,* at 598.

■ Acquiring the stock of a company for the purpose of control and acquiring the stock for the purpose of investment are not necessarily inconsistent, nor are they mutually exclusive concepts in the practical business world. The use of these concepts in the context of Section 7, however, must be restrained by the legislative intent of that statute. The purpose of Section 7 was to arrest combinations in their incipiency and before consummation. *United States v. du*

---

**5.** The Government asserts that the test for "investment" should turn solely on whether the effect of the acquisition is or may be substantially to lessen competition. Such an interpretation would give absolutely no meaning to the 2-pronged specific language Congress deliberately chose to include in the investment exemption and it would completely obliterate the investment exemption. Thus this Court doubts the validity of such an approach. In view of this Court's conclusions in respect to the effect of this acquisition, even if this approach were taken, the Court's decision for defendants herein would not change on this investment exemption issue.

**6.** This is not to say that the only two possible purposes are investment or control. In *United States v. du Pont & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), the Court found that the acquisition by du Pont of General Motors stock was not made solely for investment based upon du Pont's use of its General Motors stock position to remain a major supplier to General Motors. In the present action, however, since the Government's position is that defendants purchased this stock for control as opposed to investment, this control-investment distinction is relevant.

*Pont & Co., supra,* 353 U.S. at 597, 77 S.Ct. 872. Where by stock acquisition one corporation controls another, a combination of the two companies is necessarily created. Where control is nonexistent, there is no combination. Accordingly, in the context of a Section 7 action, this control-investment distinction is not only a valid dichotomy, but is a most useful judicial tool in tackling the investment exemption issue.

■ We find that there has been absolutely no showing that the stock acquisition herein in question was made for the purpose or even with the slightest intent of controlling Columbia. The evidence clearly shows that both Kerkorian and Tracinda made their stock acquisitions solely for investment, and with no intention of controlling Columbia. Central to this finding is the already mentioned contract between the defendants and Columbia, placing in concrete written form the assurances Kerkorian and Tracinda had previously orally given to the Columbia directors and management. We also properly rely upon and cite Kerkorian's reaffirmation of that contract during his testimony at the trial.

The contract bears a striking resemblance to the consent order submitted by the defendants in the case of *Anaconda Co. v. Crane Co.,* 411 F.Supp. 1210 (S.D.N.Y.1975). That case arose out of an offer by Crane Company to exchange certain subordinate debentures to be issued by it for five million common shares (22.6%) of the Anaconda Company, a corporation which owned a major competitor of Crane. In response to an action filed by Anaconda to restrain that offer, Crane submitted a consent order providing that Crane would be limited to the 22.6% acquisition and that Crane would not seek representation on the Board of Directors of Anaconda. *Id.* at 1217. On the basis of the consent order, the Court in that case determined that Crane did intend to hold the Anaconda stock solely as an investment. *Id.* at 1218.

As in the *Anaconda* case, the defendants here have voluntarily restricted themselves in the amount of stock they can acquire and in the extent to which they may utilize their stock to vote for directors. Moreover, unlike the *Anaconda* case where the consent order was submitted only after the offer was challenged, the contract here was agreed to well before Court action was instituted herein, and serves as even stronger evidence that at the time of the acquisition, the stock purchase was made solely for investment.

■ The Government attempts to rebut this overwhelming demonstration by arguing that the contract, upon defendants' insistence, will expire in three years.[7] The Government claims that defendants' insistence upon this time limitation shows an intent other than solely for investment. Additionally, the Government asserts that since the defendants will be free of these restrictions at the end of the three year period, they are of little effect and the Court should make a determination based upon the circumstances that will exist *after* the termination of the three year period. The fact that this contract will last three years, as opposed to ten, twenty or fifty years, bears very little weight upon the ultimate determination of intent at the time of acquisition, although the Court does take it into consideration. Defendants' willingness to enter into any such agreement providing for such restrictions for a reasonable period of time clearly shows defendants' intent at the time of the acquisition. There is no special magic to a ten year or a five year or even a three year commitment. Furthermore, the fact that Kerkorian wanted a definite time limit only shows that he did not wish to be restricted in perpetuity, foreclosing all choices in the future. An unwillingness so to restrict oneself in order to maintain some flexibility is not inconsistent with a present intent to purchase solely for investment. Furthermore, this Court will not engage in the

7. Columbia wanted the restrictions to last ten (10) years. The defendants would only agree to a three (3) year period.

guessing game argued by the Government. We do not know, in fact no one knows or can know, what conditions will exist upon the termination of this contract, and we refuse to base any judgment on pure speculation.[8]

■ The Government further argues against the applicability of the investment exemption here by pointing to a consultation provision in the Stockholders' Agreement. This provision requires Columbia to consult with Kerkorian on certain major and material financial matters and any changes in top management. The Government seems to argue that this shows an intent to control, and that through such consultation and other business and social meetings Kerkorian will or could dominate the present directors and management to such an extent that he would control Columbia. The Government, however, ignores that portion of the Agreement that provides that "[n]othing in this section shall limit the absolute and unfettered discretion of [Columbia] after such advice and consultation to act on such matters in any manner it deems appropriate." Plaintiff's Exhibit 262, at p. 5. This provision clearly convinces us that the power to control always has been, now is, and will continue to be in the present top management and Board of Directors. Furthermore, a consultation provision such as this one is not inconsistent with a present intent that the acquisition is solely for investment. Any substantial investor, acting reasonably, would want to be kept informed about the possible major fi-

nancial and top management changes contemplated in any corporation where he has placed his money.

■ Likewise, the Court gives little credence to the second main thrust of plaintiff's argument here, that Kerkorian will control Columbia through his influence over the present management and directors of Columbia. The Court has had the opportunity to observe two members of this group testifying during the course of this trial, Francis T. Vincent, Jr., President of Columbia, and Herbert A. Allen, a member of the Board of Directors of Columbia. Both of these men are confident, intelligent, articulate, self-assured, alert and responsible men. It is inconceivable to this Court how anyone could argue that these men could be mere "toadies" or "lackies" serving anyone, even Kerkorian. It is true that both of these men testified that they will listen to Kerkorian's advice and consultation. This inclination, however, is not the result of Kerkorian's stock position, but is in recognition of Kerkorian's vast knowledge and experience in the business world.[9] Accordingly, the uncontradicted evidence clearly shows that the stock acquisition in question was made solely for investment purposes and was not made with any intent to take over active managerial control of Columbia, or for any purpose other than investment.

■ As to the second prong of the investment exemption test, there can be no doubt. The Government failed to produce a single scintilla of evidence to show that Kerkorian has used, is using, or is threaten-

---

8. The Government also pointed out that the restrictions on Kerkorian and Tracinda could terminate at any time because the contract provides for an early termination in the event of the withdrawal of certain key managerial persons from employment at Columbia. Yet here again for the Court to base its judgment on this possibility would call for speculation: speculation concerning whether these key persons will ever withdraw, and speculation concerning the conditions that would exist at the time of any such withdrawal. Actually, this contract provision gives us further evidence of defendants' investment intent, since it clearly illustrates defendants' undoubted commitment and loyalty to the present management of Columbia.

9. When one considers that even if divestiture were granted with respect to the Tracinda stock, Kerkorian would still be a substantial stockholder with 5% and as such would have access to the management in order to voice his opinion, the Government's position that the additional 19% of Columbia stock gives Kerkorian a greater voice is absurd in view of the stature of the people in the management of Columbia. Indeed the acquisition by Tracinda actually undermines Kerkorian's position since the Stockholders' Agreement restricts the use of Kerkorian's stock, as well as Tracinda's, while prior to that Agreement there were no restrictions on Kerkorian's personal holdings.

ing to use, the stock by voting or otherwise, to bring about or in attempting to bring about, the substantial lessening of competition.[10] On the contrary, all the witnesses testified that there has been no actual or threatened lessening of competition since the acquisition. Accordingly, it is the determination of this Court that this acquisition of Columbia stock comes squarely within the investment exemption and thus no violation of Section 7 of the Clayton Act can be shown. And in fact none has been shown.

### POTENTIAL ANTICOMPETITIVE EFFECTS

This Court could but does not rest its decision and judgment solely on the investment exemption. The evidence clearly has shown that there will be no reasonably probable anticompetitive effects of the acquisition in question. In arriving at this conclusion it is necessary to review the evidence and applicable law with respect to the substantive prohibitions contained in the first two paragraphs of Section 7.

### A. INTERFACE BETWEEN COLUMBIA AND MGM

Columbia is engaged in the production and distribution of theatrical motion pictures, television series and features, and phonograph records and tapes. Columbia also manufactures and sells amusement games through its Gottlieb division, prints and sells sheet music, and operates radio and television stations. Columbia distributes both motion pictures produced by others and motion pictures which Columbia itself produces. In recent years, approximately one-fourth to almost one-half of the motion pictures distributed by Columbia have been produced by others.

MGM owns and operates two hotel-casinos in Nevada, has begun construction of a third hotel-casino in New Jersey, owns and operates a laboratory which processes motion picture film, owns and operates a sound studio where space is leased to others, owns an office building where space is leased to others, owns a library of motion pictures, produces motion pictures and other programs intended for initial viewing on television, and produces theatrical motion pictures. The theatrical motion pictures produced by MGM are distributed in the United States and Canada by United Artists Corporation (hereinafter "UA"). Cinema International Corporation (hereinafter "CIC") distributes MGM pictures in other countries.

MGM was a distributor of motion pictures to theatres until it went out of that business in approximately October 1973. Since that time MGM has not distributed to any theatre any motion picture, whether produced by MGM or by any other producer. When MGM went out of the distribution business it sold all its distribution facilities located in the United States and abroad and severed its employment relationship with every one of the persons employed in its distribution operations, except for a few persons who were offered positions in other parts of MGM's business. In accordance with a contract entered into between MGM and UA in October 1973, MGM pays UA 22.5 percent of the gross film rentals of each MGM-produced picture, as a fee for UA's distribution of the picture. None of MGM's capital is invested in any facility for the distribution of motion pictures. Since it went out of the distribution business, MGM has not entered into any

---

**10.** In the substantive provisions of the first two paragraphs of Section 7, Congress showed concern for the probable future consequences of the acquisition by utilizing the language "*may be* substantially to lessen competition." On the other hand, with the investment exemption, Congress exhibited a concern for the past and present effect of the acquisition by utilizing the language "and not *using* the same . . . to bring about . . . the substantial lessening of competition." Thus while evidence of com-

petitive conduct since the acquisition may not be a determining factor when discussing whether a violation of the substantive provisions of Section 7 has occurred, *Ash Grove Cement Co. v. F.T.C.*, 577 F.2d 1368, 1378–1380 (9th Cir. 1978), this evidence is of primary concern when determining the application of the investment exemption. *See Anaconda Co. v. Crane Co.*, 411 F.Supp. 1210, 1219 (S.D.N.Y. 1975).

contract with any exhibitor of motion pictures to license the exhibition of any motion picture.

At the time MGM left the business of distribution, it made a major change in its production arm as well. At that time, MGM decided to reduce substantially its production of motion pictures. From late 1973 to date MGM has produced only two to five pictures in each year, while in the past MGM had produced three to four times that many motion pictures in each of the prior five years. MGM hoped that by this action it could maintain better control of the quality of its product.

It is in the context of potential competition between these two companies that this acquisition is to be judged. As noted in *Brown Shoe v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Clayton Act only prohibits acquisitions where the effect may be substantially to lessen competition, "in any line of commerce in any section of the country." Accordingly, this Court is first required to determine the relevant market, the area of effective competition. This determination is to be made by reference to a product market ("the line of commerce") and a geographic market ("the section of the country"). *Brown Shoe Co. v. United States, supra*, at 324, 82 S.Ct. 1502, 1523.

## B. THE PRODUCT MARKET

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. Within this broad market, however, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. *Brown Shoe Co. v. United States, supra*, at 325, 82 S.Ct. 1502.

■ Throughout its complaint, plaintiff referred to the product market as the production and distribution of motion pictures. In pretrial and in trial, plaintiff attempted to narrow this product market in two respects: (1) to motion pictures grossing over one million dollars and (2) to "quality" motion pictures. This Court finds both of these attempts to narrow the product market inappropriate when measured against the *Brown Shoe* criteria.

Plaintiff's contention that only motion pictures grossing over one million dollars are in the effective area of competition draws an arbitrary distinction with no basis in fact. Relative success of a particular product is not a factor contained in the *Brown Shoe* analysis. To argue that motion pictures grossing one million dollars compete with each other while motion pictures grossing $999,999 do not compete is a flight of fantasy this Court will not take. This distinction is not recognized by the public; whether grossing more than one million dollars, or grossing less, each motion picture is manufactured with the same facilities; as a product line, each does not have characteristics peculiar to itself rendering it generally noncompetitive with others; and each is not directed toward a distinct class of customers.

This same analysis is equally applicable to the "quality" distinction asserted by plaintiff. Again, this distinction bears little relation to reality. Time and again this Court was presented with examples of low-budget or "non-quality" motion pictures made by independent or minor producers that were very successful in the market place and that effectively competed with the high budget or "quality" motion pictures produced by various of the major producers. The distinctions plaintiff has attempted to draw are as unrealistic in this case as the "price/quality" differences rejected in the *Brown Shoe* case. Accordingly, this Court finds the relevant product market to encompass motion pictures generally.

Plaintiff also has maintained throughout this action that production *and* distribution

of motion pictures represents a cluster of activities composing a single line of commerce. The concept of a "cluster of activities" giving rise to a single line of commerce has previously been raised in *United States v. Philadelphia National Bank*, 374 U.S. 321, 356, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), and in *United States v. Phillipsburg National Bank*, 399 U.S. 350, 359, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). In these cases, the cluster of activities, such as demand deposits, savings and time deposits, consumer loans, commercial and industrial loans, real estate mortgages, trust services, safe deposit boxes and escrow services were customarily provided by commercial banks, the Court finding the line of commerce to be "commercial banking."

A review of these facts leads to the conclusion that plaintiff herein has not properly applied this concept of a "cluster of activities." The activities in the two bank cases were all activities that would be provided a customer at the same level of a vertical chain of a particular product. In the present action, however, the activities involved, production and distribution, are not on the same level but are on two different vertical steps leading ultimately to the exhibition of motion pictures to the public. Thus this action is more closely aligned with the *Brown Shoe* case. The *Brown Shoe* case dealt with the merger of two large shoe companies. Each shoe company engaged in both the manufacturing and retailing of shoes, again two different steps in the vertical chain of this particular product. The Court in *Brown Shoe* did not define the line of commerce as the manufacture and retail of shoes. Rather the line of commerce was defined by the product itself, men's, women's and children's shoes, separately. It is interesting to note, moreover, that in discussing the horizontal effects of the merger, both the lower court and the Supreme Court considered manufacturing and retailing separately and not jointly. Thus, implicitly, if not expressly, both courts by their analysis found these two different steps on the vertical chain of this product to be two separate and distinct lines of commerce.

In the present action, the evidence is overwhelming and virtually without contradiction that motion picture production, motion picture distribution, and motion picture exhibition are each separate and distinct lines of commerce within the commercial realities of the motion picture industries. The evidence is equally overwhelming and again virtually uncontradicted that the production and distribution of motion pictures, taken together, is not a single line of commerce within the commercial realities of the motion picture industry. Production and distribution are recognized as separate and distinct activities; each utilizes separate and distinct facilities; and each has characteristics peculiar to itself rendering it generally noncompetitive with the other.

In the present action, production of motion pictures is the only relevant line of commerce. As stated earlier, in determining the relevant line of commerce, the Court's attention should be directed to the effective area of competition. Columbia engages in both the production and distribution of motion pictures. There is no question, however, that since 1974, MGM has not engaged in motion picture distribution.

Plaintiff has attempted to assert that MGM still is in the business of distribution of motion pictures based upon its relationship with UA. Under the terms of the distribution contract between MGM and UA, the power of approval of the policy decisions is mutual while UA has control over the day to day operation of the distribution of MGM motion pictures. It is common in the motion picture industry for producers to participate with their distributors in making the decisions regarding key aspects of the distribution process, such as the release date, the release pattern, the selection of theaters to exhibit the picture, the advertising budget, and the terms of contracts with exhibitors. That practice is reflected in the contracts between producers and distributors, such as MGM's distribution agreements with UA and CIC; a producer

such as MGM does not become a distributor by reason of such joint participation with its distributor in such distribution decisions.

Some producers engage independent contractors called "producers' representatives" to assist them in dealing with distributors on such matters as release patterns, advertising campaigns, marketing strategies, and other matters relating to the distribution of the producer's picture. MGM uses several of its employees to perform these same functions. The use of "producers' representatives," whether they be independent contractors or employees, does not transform a producer into a distributor.

It is clear from the evidence at trial that MGM does not compete with Columbia in distribution and has not done so since late 1973. Accordingly, the only effective area of competition herein involved is the production of motion pictures. It inevitably follows that the relevant product market, or line of commerce, is production; *not* production *and* distribution.

### C. GEOGRAPHIC MARKET

■ The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market. Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both correspond to the commercial realities of the industry and be economically significant. *Brown Shoe Co. v. United States, supra*, 370 U.S. at 336, 82 S.Ct. 1502. The Court has also looked to the area where the effect of the merger on competition will be direct and immediate. *United States v. Marine Bancorporation*, 418 U.S. 602, 619, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1973). Additionally, the relevant geographic market is the market area in which the seller operates "and to which the pur-

chaser can practically turn for supplies." *United States v. Phillipsburg National Bank & Trust Co., supra*, 399 U.S. at 357–358, 90 S.Ct. at 2043; *United States v. Philadelphia National Bank, supra*, 374 U.S. at 359, 83 S.Ct. 1715; *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

■ The evidence shows in the present action that the market for production of motion pictures is world-wide. Foreign produced motion pictures directly compete in the United States with films domestically produced. Furthermore, domestic production companies derive a substantial portion of their income from foreign distribution and this in turn substantially affects the ability of these companies to compete domestically. Accordingly, the most relevant geographic market for motion picture production in this action is the entire world, since that is the market area in which motion picture producers operate and to which the distributors of motion pictures can practically turn for supplies of motion pictures.[11]

### D. ABSENCE OF ANTICOMPETITIVE EFFECT OR PROBABLE ANTICOMPETITIVE EFFECT

■ In determining whether the subject acquisition violates Section 7, this Court is bound by prior case law which has held that a plaintiff must show that the particular acquisition is reasonably probable to effect a substantial lessening of competition or tend to create a monopoly. This section does not require certainty concerning the proscribed effect, neither does the statute deal with ephemeral possibilities. This Court is required to look to the probable future effects of the acquisition. *Brown Shoe, supra*, 370 U.S. at 323, 82 S.Ct. 1502.

Prior cases have looked at various factors in making this determination. The *Brown Shoe* case was primarily concerned with the

---

11. This is not to say that this Court will look to the world-wide effects for all purposes. This Court is well aware of the limits contained within Section 7 when it refers to any section of the *country*. The Court's conclusion with respect to the geographic market rests in a recognition of the extent to which the world-wide nature of this industry effects competition here in the United States.

relative market share which companies may control by merger and also the trend in that particular industry toward an increased concentration of the market by the top producers and retailers. *Brown Shoe Co. v. United States, supra,* 370 U.S. at 343, 82 S.Ct. 1502. Later cases, however, have moved away from this strict reliance on statistics and toward a more comprehensive view of the industry. The Court has stated that Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry. Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger. *United States v. General Dynamics Corp.,* 415 U.S. 486, 498, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1973). The primary question then is the effect on competition generally in an economically significant market.

▪ In the present action, plaintiff has utterly failed to show any anticompetitive effect. All the credible evidence points to the opposite direction, that there will be no substantial lessening of competition as a result of the subject acquisition. There has been no evidence that competition between MGM and Columbia will be affected, let alone evidence that competition in the line of commerce would be affected. Much of the prior case law speaks in terms of merger. While defendants have effective control of MGM, they do not control Columbia

by reason of this acquisition. As discussed earlier, defendants are limited in their use of the stock in question and the day to day operation of Columbia is and will remain in the hands of the present management. Accordingly, at the present time it is absurd to talk of merger. The evidence clearly and uncontradictorily points to the conclusion that these two companies will remain separate companies, operating separately and competing against each other.

Plaintiff has suggested the existence of anticompetitive effects in only two particulars: (1) defendants will use their position to gain access to competitively sensitive information to better the position of one company to the detriment of the other; and (2) defendants will use their control of MGM to cease production of motion pictures in that company.[12] Neither of these fears are supported by the evidence. The Stockholders' Agreement entered into by the defendants and Columbia specifically restricts the defendants' access to competitively sensitive information.[13] Furthermore, it is ludicrous to argue that the defendants, who have substantial investments in both companies, would do anything that would competitively hurt either company. This is not a situation where the investment in the acquired company is minor compared to the investment in the acquiring company. Additionally, it is equally illogical to suggest that the management of Columbia would allow the defendants access to competitively damaging information when they are not required to do so. In regard to the second alleged anticompetitive effect, all the credible evidence showed that both Columbia and MGM are still in the motion picture

12. The possible vertical aspects of this acquisition have never been raised by the Government and are not properly before the Court. Even if these effects were before the Court, this decision would not be altered. The present contract between MGM and UA prevents any vertical consolidation between MGM and Columbia. This contract runs through 1983. This Court will not speculate with respect to what conditions will exist at that time and will not base this ruling on such speculation. Furthermore, the vertical aspects are taken into consideration later in the Court's conclusions with regard to the competitive effect of this acquisition even if the line of commerce is assumed to be production *and* distribution, which it is not.

13. If divestiture were to be ordered with respect to Tracinda's holdings, Kerkorian would still retain a substantial interest in Columbia and possibly would no longer be restricted by the Stockholders' Agreement. Thus there might arguably be less of a likelihood that competitively sensitive information will fall into the wrong hands so long as Tracinda retains its stock and the Stockholders' Agreement remains in effect.

production business with no proclivities to lessening production below present levels. Accordingly, the Court is absolutely convinced that the subject stock acquisition will not result in a substantial lessening of competition.

■ Even assuming a merger of MGM and Columbia, plaintiff has failed to show the requisite anticompetitive effect. Plaintiff primarily relied upon a statistical showing of relative market shares. These statistics were taken from data published annually by *Variety*, a newspaper specializing in news events in the entertainment industry. Annually, *Variety* publishes lists purporting to show all motion pictures having gross rentals [14] in the United States and Canada of one million dollars or more, together with a figure purporting to be the gross rentals for each particular picture.

This data, however, is totally irrelevant for use in this action. The effective area of competition herein relevant is the production of motion pictures. This data does not even purport to represent relative market shares in this line of commerce. The figures contained in the *Variety* data are the rentals received by the *distributors* not the producers. It may be argued that the Court could extrapolate upon this data to determine various producers' market share, since many of the major producers distribute their product through their own company and as a result the distribution figures are relevant in determining production figures. This, however, is folly, because while some major producers distribute through their own companies, the distribution arms of these major companies also distribute many motion pictures produced by other companies. Additionally, the terms of these distribution agreements between the distribution arms of major companies and the independent producers vary considerably; as a result, any sort of factual division

of these revenues between distribution and production is impossible without more specific data. The use of the *Variety* lists as a proxy for dollar volume of commerce would ignore these facts and attribute to each distributor the full rentals, even if that distributor kept only its fee and its expenses, and remitted the balance to an unrelated and independent producer. Two important distortions would occur: (1) A highly disproportionate amount of the dollar volume of commerce would be attributed to distributors and therefore improperly imply a degree of concentration among those firms; and (2) Columbia's market position would be overstated because it would incorrectly attribute to Columbia as a producer the revenues Columbia remits to the independent producers whose many pictures it distributes.

In any event, *Variety* lumps together the totals for the United States and Canada, whereas the uncontradicted testimony of one of plaintiff's own witnesses was that there can be very sharp differences in the popularity of particular pictures in the United States and in Canada.[15] Since this data does not represent a measure of the relevant line of commerce, it is irrelevant for these proceedings.

Assuming this data is relevant, its obvious unreliability leads this Court to totally discount it. This data is derived from lists compiled by *Variety* reporters from data supplied voluntarily by some, but not all distributors, on a non-uniform basis, subject to no systematic verification, but subject to such adjustments as the intuitive judgments of *Variety* reporters dictate. Mistakes are common. For example, the 1978 *Variety* list of annual film rentals, while purporting to report every motion picture having rentals in the United States and Canada of one million dollars or more in 1978, omitted at least 29 pictures having

---

**14.** As used in the context of the *Variety* lists, gross rentals means the total amount a distributor receives from an exhibitor for one particular motion picture.

**15.** In its complaint, the Government alleged other uses for motion pictures to be for com-

mercial television broadcasts, pay cable television broadcasts, and for use in the home video disc and cassette playback units. The *Variety* lists do not purport to measure the income from these sources. Thus, again, the relevance of this data must be questioned.

total rentals of $195.3 million, including "Saturday Night Fever," a Paramount picture having gross rentals of about $71.5 million. "Saturday Night Fever," if not omitted, would have been *Variety's* second ranking picture of 1978.

Plaintiff's efforts to supply some of the omitted film rental data during trial, and after defendants had pointed out many *Variety* deficiencies, failed to discharge plaintiff's burden to show the volume of commerce in the relevant line of commerce. The corrections were themselves based on other stories appearing in *Variety*, the accuracy of which is subject to many of the doubts which apply to the *Variety* lists initially relied on by plaintiff.

In this case, there is no market share data at all on production; and only totally unreliable data has been offered by plaintiff as to distribution, and as to "production and distribution." Moreover, plaintiff's so-called "production and distribution" data, as modified at trial, would not, even if reliable, make out a *prima facie* violation of Section 7. Even plaintiff's revised data, as shown on plaintiff's exhibit 315, set forth for the period 1975–1978 an MGM average share of 2.2% and a Columbia average share of 9.7%, well below the level normally considered by plaintiff for legal action under its Merger Guidelines. 1 CCH 1977 Trade Reg. Rptr. ¶ 4510, at 1, 6, pp. 6881, 6884. Furthermore, the data, as shown on defendant's exhibit GGGG, set forth for the period 1974–1978 an MGM average share of 1.75% and a Columbia average share of 6.72%, even further below plaintiff's Merger Guidelines. While those Guidelines do not bind this Court, they reinforce this Court's conclusion that no tendency toward a lessening a competition will ensue from the subject acquisition. Accordingly, while the Court has rejected plaintiff's theory that the production and distribution of motion pictures constitutes a single line of commerce, if the Court were to assume the existence of such line of commerce and if the Court were to assume the merger of MGM and Columbia, there would be no reasonable probability of a substantial lessening of competition or any tendency to create a monopoly in any geographic market, either in the United States, any section of the United States or throughout the world.

The history, structure and probable future of the motion picture industry support this Court's conclusions. There are hundreds of firms (even thousands) engaged in motion picture production and many new firms have entered motion picture production recently. There are no barriers to entry into the business of motion picture production. A relatively small investment is required to enter motion picture production, and all of the elements necessary to carry on the business of motion picture production are in plentiful supply and easily available, including numerous sources for financing production. Approximately four hundred theatrical motion pictures are produced in the United States alone each year and rated by the Motion Picture Association of America Rating Service. According to the Motion Picture Association of America, about three-fourths of the rated motion pictures are released each year.

Motion picture producers individually and as a whole lack significant market power because many other forms of entertainment and leisure collectively constitute a good substitute for consumer expenditures on motion pictures. Any numerical expression of a firm's share of the motion picture production market, while not provided by plaintiff at the trial herein, would necessarily depict significantly less market power than the same numerical expression would depict in industries where there are no individual or collective substitutes for the product. There are no dominant firms engaged in the production of motion pictures who engage in interdependent or parallel behavior with the capacity effectively to determine price and total output of goods and services.

Plaintiff attempted to show a dominance by eight major companies. Plaintiff's data, however, failed to show a highly concentrated market. On the contrary, the evidence has shown a dynamic market with heavy competition from outside these major

eight and within these majors, with one additional company, American International Pictures, on the verge of being recognized, and indeed being recognized, as a "major" and an additional company, Associated Film Distributors, thereby entering the market on the scale of a "major" company.

▇▇▇▇▇ In ranking the various companies plaintiff has placed Columbia fifth and MGM ninth among the major companies. There is little argument concerning the placing of Columbia within the "major" companies. MGM's placement, however, is based on nostalgia rather than present day fact. MGM, since 1974,[16] has produced approximately four theatrical motion pictures per year, or approximately one percent or less of the total number of theatrical motion pictures produced in the United States alone. While MGM is an important producer, it is by choice no longer one of the major companies, as compared to other production companies.

Even taking into consideration the distribution of motion pictures, the structure and history of this market shows dynamic competition. Entry into motion picture distribution, while not as easy as entry into motion picture production, is also relatively easy. There are a large number of firms, probably more than one hundred, engaged in motion picture distribution in the United States alone. Recent entrants into motion picture distribution, such as Associated Film Distributors, demonstrate that entry is not difficult. This healthy competition, and lack of substantial barriers to entry, limit the ability of any company or companies to establish a monopoly or exert market power. Motion picture distributors individually and as a whole lack significant market power because many other forms of entertainment and leisure collectively constitute a good substitute for consumer expenditures on motion pictures. There are no dominant firms engaged in the distribution of motion pictures who engage in interdependent or parallel behavior with the capacity effectively to determine price and total output of goods and services.

▇▇ Plaintiff has failed to prove that there is concentration in the relevant market. Plaintiff has therefore failed to make out a *prima facie* case of an antitrust violation. Such a case is made out only if there is also proof that the industry is one "where concentration is already great or has been recently increasing . . . ." *United States v. General Dynamics Corp.*, 415 U.S. 486, 497, 94 S.Ct. 1186, 1194, 39 L.Ed.2d 530 (1974). In any event the production of motion pictures is not an industry where concentration is already great or has been recently increasing. Thus, no *prima facie* case could have been made solely by the use of statistics asserted by plaintiff to show MGM's and Columbia's shares of "production and distribution."

Even if plaintiff had shown that motion picture production were greatly concentrated or recently increasing in concentration, and even if plaintiff had shown the combined share of MGM and Columbia of either of such markets, such market-share statistics would have given "an inaccurate account of the acquisition's probable effects on competition." *United States v. Citizens and Southern National Bank*, 422 U.S. 86, 121–122, 95 S.Ct. 2099, 2119, 45 L.Ed.2d 41 (1975); *United States v. Marine Bancorporation*, 418 U.S. 602, 631, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. General Dynamics Corp.*, 415 U.S. 486, 497–498, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). Even if

16. In determining whether there has been a violation of Section 7, this Court is primarily concerned with the probable future effects of the acquisition. The present condition of the industry and the participants to the acquisition is of chief importance. Evidence of past conditions can also be helpful in determining future effects. The further one retreats into the past, however, the less relevant will be the evidence retrieved. In view of MGM's major reorganization of late 1973, this Court holds that the statistics and other evidence alleged to show the volume of commerce and the market shares of individual firms in the motion picture industry in years prior to 1974 do not represent current conditions and do not aid in predicting the probable competitive effects of defendants' acquisition of Columbia stock. Accordingly, such evidence of years prior to 1974 is held to be inadmissible.

the statistical data offered by plaintiff were reliable, all relevant industrial facts show that the subject acquisition would not lessen competition in violation of section 7 of the Clayton Act. *Id.*

At this point, the Court perhaps should indicate that both during the trial and in the decisional process it discounted as unreliable and unscientific much of the expert testimony offered by the plaintiff, while relying heavily upon the technical economic skills and knowledge of the defense expert and the two Court appointed experts. The reasons for this preferential conclusion of the Court on expert credibility is best illustrated by a comparison of the *curricula vitae* and expertise of the Government witnesses, Gerald Hellerman, a "Financial Analyst" and Philip M. Eisenstat, an "Applied Statistics" expert, both employees of the Antitrust Division of the United States Department of Justice, on the one hand, with those of the defense witness, James Mack Folsom, Vice-President of Glassman-Oliver Economic Consultants, Inc., and the Court appointed witnesses, Dr. Robert Wayne Clower, U.C.L.A. Professor of Economics, and Dr. J. Fred Weston, Professor, Graduate School of Management at U.C.L.A.

It is informative and interesting to compare the resume of Eisenstat, and testimony of Hellerman (Appendix A), *with* Curriculum Vitae of Folsom, Biographical Summary, etc., of Clower, and Bio-Bibliography of Weston (Appendix B). Moreover, their respective testimonial statements confirm the Court's belief in the superior knowledge and expertise of Folsom, Clower and Weston, as conclusively becomes evident when one compares the testimony of Hellerman, Rep. Tr. pp. 1356–1440, and Eisenstat, Rep. Tr. pp. 1709–1932, *with* the testimony of Folsom, Rep. Tr. pp. 1935–2100, Clower, Rep. Tr. pp. 2111–2263, and Weston, Rep. Tr. pp. 2264–2411.

 Plaintiff has not shown that the production or the distribution of motion pictures is either concentrated or recently increasing in concentration. The statistical showing by plaintiff of MGM and Columbia combined market shares—MGM 2.2% plus Columbia 9.7%, combined shares 11.9% for the years 1975–1978 (Ex. 315), or MGM 1.75% plus Columbia 6.72%, combined shares 8.47% for the years 1974–1978 (Ex. GGGG) —even if reliable, does not make out a violation of Section 7 of the Clayton Act. *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974). In *United States v. Tidewater Marine Service, Inc.,* 284 F.Supp. 324, 338–342 (E.D.La.1968), the court held that even if the combined shares were 31 percent, the merger would not be unlawful because the market was not concentrated but was vigorously competitive, and entry was not difficult. To like effect is *United States v. International Harvester Co.,* 1976–2 Trade Cases ¶ 61,028 at 69,527 (N.D.Ill.1976), *aff'd,* 564 F.2d 769, 773 (7th Cir. 1977), *reh. denied* and *reh. en banc denied* (1978), where the court ruled that the combination of market shares of 8 percent and 14 percent of four-wheel drive tractors was not unlawful in context, where the top four firms had a 73 percent share, where one of the participants had a weak financial position (but was not a failing company), and where the industry was vigorously competitive and trending away from concentration. *See also United States v. Crowell, Collier & MacMillan, Inc.,* 361 F.Supp. 983 (S.D.N.Y.1973) (combination of firms of 41.9% and 0.6% not barred); *United States v. M.P.M., Inc.,* 397 F.Supp. 78 (D.Col.1975) (combined market share of 31.6% held not anticompetitive); *United States v. Consolidated Foods Corp.,* 455 F.Supp. 108, 134–141 (E.D.Pa.1978) (combining nation's fourth largest firm in industry having a 7% share with the eleventh firm having a 3% share, where top three ranking firms after the merger would control 62.5% of the market, held not anticompetitive); *In re* the Pillsbury Company and Fox Deluxe Foods, FTC Dkt. 9091, opinion of the Commission, 17–18 (June 15, 1979) (combining 15.4% with 1.7% is not unlawful, even though industry was "concentrated").

Conditions in the production of motion pictures differ from conditions in the grocery industry as described in *United States v. Von's Grocery Co.,* 384 U.S. 270, 86 S.Ct.

1478, 16 L.Ed.2d 555 (1966), conditions in the beer brewing industry as described in *United States v. Pabst Brewing Co.*, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) and conditions in the business of manufacturing aluminum and copper conductors as described in *United States v. Aluminum Co. of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), in these important ways: (a) there is no trend in concentration in the production of motion pictures; (b) there is no trend toward horizontal integration in the production of motion pictures; (c) there are no significant economic barriers to entry into motion picture production; and (d) there is no shrinkage in the number of firms engaged in motion picture production. Further, in *Alcoa*, the products in question were made by the leading firm (27.8% and 32.5% of the relevant markets) in a highly oligopolistic industry.

## CONCLUSION AND ORDER

The Government attempted to shape the contours of the action by referring to the profiles of totally unreliable statistics which happened to be readily available. The slavish reliance placed on this unreliable data by the Government is not warranted when one looks at the realities of this industry and, specifically, the realities of the two motion picture production companies, MGM and Columbia. These realities as found by

this Court, based upon all the evidence before it, clearly show that neither the subject stock acquisition, nor the use of such stock by voting or granting of proxies or otherwise, nor the possible merger of Columbia and MGM does or would substantially lessen competition, or does or would tend to create a monopoly; nor is there any threat whatsoever that any such thing may occur.

Therefore, there is no possible violation of section 7 of the Clayton Act. And, finally, as initially found and concluded by the Court, the investment exemption set forth in the first sentence of the third paragraph of Section 7 of the Clayton Act, 15 U.S.C. § 18, clearly and convincingly applies to this stock acquisition and takes both defendants, Kerkorian, and Tracinda, out of its prohibitory parameters.[17]

It ineluctably follows that the plaintiff is not entitled to any order requiring the defendants or either of them to divest themselves of any of the stock of Columbia purchased and now held by them.

One last matter remains and that is the question of whether to award the usual allowable costs to defendants and against plaintiff. All parties agree that this determination is within the discretionary power of the Court. After consideration of the entire case, its complexity, the difficult

17. Incidentally, the Government's non-expert witnesses were drawn chiefly from small film exhibitors and all of these witnesses, curiously enough, testified that they had no evidence of any act or threat, that could by the wildest imagination be traced to either of the defendants, that would tend to show that the defendants had purchased any portion of the Columbia stock other than solely for investment, or that the defendants had used, were using, or threatened in any way to use the stock by voting or otherwise to bring about or in attempting to bring about the substantial lessening of competition. Nor could the Government witnesses give a shred of credible evidence that the effect of the Columbia stock acquisition was, could be, may be, or might even possibly be, substantially to lessen competition, or to tend to create a monopoly in any line of commerce in any section of the country.

Moreover, these Government witnesses, which ran the gamut from an admitted pornog-

rapher, through small, middle size and one or two fairly large film exhibitors, to retired financial experts without any recent expertise other than occasional consultations, and the chief of the "Star Wars" producer, in every instance but one or two vague guesses or opinions, admitted that the relevant line of commerce was production, *not* production *and* distribution, and that there is no concentration, monopoly or denial of access to new producers in this relevant line of commerce. Even some of the Government witnesses opined that the relevant geographical market is world-wide, and not merely the United States or the United States and Canada, and that competition in production was and is being increasingly manifest, in its effect, both in increasing competition in the United States and increasing competition in *every section of the United States* in film production.

questions of law involved, and the tremendous factual work load and legal burden undertaken and so successfully carried by defendants, the Court exercises its discretion in favor of defendants and against plaintiff, even though plaintiff is the Government. Rule 54(d), F.R.Civ.P.; 28 U.S.C. § 2412; Local Rule 15, C.D.Cal.; *United States v. O.K. Tire & Rubber Co.,* 1978–2 CCH Trade Cases, par. 62,331, p. 75,973 (D. Idaho 1978); *Subscription Television, Inc. v. Southern California Theatre Owners Assoc.,* 576 F.2d 230, 234 (9th Cir. 1978); *United California Bank v. THC Financial Corp.,* 557 F.2d 1351, 1361 (9th Cir. 1977).

LET JUDGMENT BE ENTERED ACCORDINGLY.

## APPENDIX A

1. Resume of Philip M. Eisenstat
2. Curriculum Vitae (via testimony) of Gerald Hellerman

### RESUME OF
### PHILIP M. EISENSTAT

**Education:** B.B.A. (1970) Temple University.

1971–1974 Graduate School Northwestern University. Completed all course requirements for Ph.D.

1977–1978 Georgetown University Law School.

**Work Experience:** Economist, Antitrust Division, U.S. Department of Justice, testified in:

*U. S. v. Dairymen Inc.*

*U. S. v. Mid-America Dairymen, Inc.*

*U. S. v. Culbro*

**Publication & Papers:** Joint papers written with Rob Masson, Regulation as a Source of Monopoly.

An Economic Analysis of the Associated Milk Producers Inc. Monopoly.

A Stochastic Rationale for Predatory Pricing.

---

### HELLERMAN—DIRECT

Transcript of his Deposition.

Mr. Weidman: That's right. Mr. Hellerman had been deposed by counsel.

The Court: Well, all right. At least I take it the defendants are aware of it, but we still don't have a curriculum vitae. Where is that little piece of paper that apparently was given to the defense. Has anybody got it?

Mr. Rothman: Your honor, we can't locate it.

The Court: All right, Mr. Hellerman, but go ahead. But I'll give you five minutes at the most. Give us your curriculum vitae.

Don't ask any questions. He can just narrate it to save time.

The Witness: In 1959, I received a Bachelor of Arts degree with a major in economics from the University of Massachusetts in Amhurst.

In 1962, I received a Masters of Business Administration, also from the University of Massachusetts.

At graduate school, I received a teaching fellowship based on class standing.

My Work: In 1962, I started to work at the Securities and Exchange Commission as a financial analyst in the branch of investment companies.

The Court: In what?

The Witness: In the branch involved with investment company regulation.

The Court: Branch investment companies?

The Witness: The branch involving the work of regulating investment companies.

The Court: All right.

The Witness: Under the Investment Company Act of 1940.

The Court: All right.

The Witness: In 1967, I was promoted to Branch Chief of the Public Utility Holding Company Act of 1935.

The Court: All right.

The Witness: In 1972, I was requested by Senator Phillip A. Hart, Chairman of the Anti-Trust and Monopoly Subcommittee of the United States Senate, to be detailed to his subcommittee to act as special adviser.

The Court: Subcommittee of what?

The Witness: Of the judiciary committee.

The Court: All right.

The Witness: Of the United States Senate.

The Court: All right.

The Witness: In 1976, I joined the anti-trust division of the Department of Justice and I am presently employed there.

The Court: All right. I think that's enough. Go ahead. I think he's qualified as an expert.

By Mr. Weidman:

Q. Mr. Hellerman, as part of your duties with the anti-trust division, have you been an advisor to the trial staff of *United States vs. Tracinda* ?

A. That is correct.

Q. And what have you done along those lines?

A. I have made recommendations as to witnesses, potential witnesses or people knowledgeable in the industry. I have accompanied counsel to various interviews, and I have advised during the court proceeding on matters which dealt with finance and corporate matters.

Q. As part of your duties, did you study the financial condition of Columbia and MGM?

A. Yes. I've had a computer print out done at one point of all the companies—or of many of the companies in the motion picture industry which is sort of a knee jerk reaction when assigned to an industry or asked to work on an industry.

## APPENDIX B

1. Curriculum Vitae of James Mark Folsom
2. Biographical Summary, etc., of Robert Wayne Clower
3. Bio-Bibliography of J. Fred Weston

JAMES MACK FOLSOM

CURRICULUM VITAE

HOME: 6200 Wilson Blvd.
\# 1116
Falls Church, Virginia 22044
(Telephone: 703–534–0682)

OFFICE: Vice-President
Glassman-Oliver Economic
Consultants, Inc.
1725 K Street, N.W.
Suite 801
Washington, D.C. 20006
(Telephone: 202–331–1946)

DATE & PLACE OF BIRTH: May 16, 1932
Barney, Georgia

EDUCATION:

| Institution Attended | Dates | Degree |
|---|---|---|
| Georgia Southwestern College | 1949–51 | |
| University of Georgia | 1951–53 | BBA (Marketing) |
| Vanderbilt University | 1953–54 | |
| ˮ ˮ | 1956–59 | |

(Completed all requirements for Ph.D. except thesis.)

Major Fields: Industrial Organization and Agricultural Economics

HONORS, SCHOLARSHIPS, FELLOW-SHIPS:

Special Scholarship, Vanderbilt

Earhart Fellowship—2 years

Ford Foundation Dissertation Fellow

Validictorian, UGA, Class of '53

Phi Kappa Phi National Honorary

Beta Gamma Sigma National Honorary

Distinguished Service Award, FTC

PROFESSIONAL EXPERIENCE:

Research Assistant—Displaced Person's Adjustment to U.S. Economy, Gregor Sebba, UGA.

Instructor, Industrial Organization and Statistics, Vanderbilt, Summer 1959.

Instructor and Assistant Professor, Duke University, 1959–64. (Courses Taught: Principles of Economics, Marketing, Managerial Economics, and Industrial Organization.)

Economist, Division of Economic Evidence, Bureau of Economics, Federal Trade Commission, 1964–68.

Assistant to the Director, Bureau of Economics, Federal Trade Commission, 1969.

Chief, Division of Economic Evidence, Bureau of Economics, Federal Trade Commission, 1970–72.

Assistant Director, Bureau of Economics, Federal Trade Commission, 1972–73.

Acting Director, Bureau of Economics, Federal Trade Commission, 1973–74.

Deputy Director, Bureau of Economics, Federal Trade Commission, 1974–77 and 1978.

Acting Director, Bureau of Economics, Federal Trade Commission, 1977–78.

PUBLICATIONS AND TESTIMONY:

"Trends in Employment and Earned Income of Older Workers" with Juanita M. Kreps and C. E. Ferguson, *Employment, Income, and Retirement Problems of the Aged*, Duke University Press, 1963.

*The Use of Games of Chance in Food and Gasoline Retailing*, FTC Economic Report, 1968.

*The 1973 Line of Business Report*, FTC Economic Staff Report, 1967, with F. M. Scherer, et al.

Comment on State of Competition in Food, forthcoming in *Journal of Agricultural Economics.*

Testified in: S&H, Allied Chemical—Jim Robbins, Great Lakes Carbon, Papercraft, Kennecott-Peabody, and General Dynamics.

Testified before several congressional committees on diverse subjects—Sweepstake Promotions, Price Discrimination, Small Business Role in Economy, Food Retailing, Steel Imports and on FTC Budget.

Speeches before lawyers (e. g., Practicing Law Institute) and business groups.

ROBERT WAYNE CLOWER

I. *Biographical Summary*
(as of August 1, 1979)

*Degrees*

Doctor of Letters, Oxford University, 1978

Master of Letters, Oxford University, 1952 (Thesis: Theories of Capital Accumulation with Special Reference to their Ability to Explain the Experience of the United States since 1870)

M.A. Econ., Wash. State Univ., 1949 (Thesis: A Theory of Economic Prognosis Applied to Modern American Society)

B.A. Econ., with Highest Distinction, Wash. State Univ., 1948 (Thesis: The Keynesian Contribution to Economic Positivism)

*Learned Societies and Professional Associations*

American Econ. Assn. (Member of Executive Committee, 1978–80);

Royal Econ. Society; Econometric Society (Fellow since 1978);

American Assn. of Rhodes Scholars; Phi Kappa Phi; Phi Beta Kappa;

Honorary Fellow, Brasenose College, Oxford

*Professional Career*

Professor of Economics, UCLA, 1971 to present

Adjunct Professor, Washington State University, 1978–

Visiting Prof. of Econ., Univ. of Western Ontario Fall, 1974 and Fall, 1977

Visiting Prof., Institute for Advanced Study, Vienna, Austria March, 1974

Visiting Prof., Bank of Italy Research Staff Seminar, Perugia, Italy Oct., 1973

Visiting Prof., Monash Univ., Summer, 1972

Dean, School of Social Studies and Prof. of Econ., Univ. of Essex 1968–69

Visiting Prof. of Econ., Makerere College, Kampala, Uganda Summer, 1965

John Maynard Keynes Visiting Prof. of Econ., Univ. of Essex 1965–66

Prof. of Econ., Northwestern Univ., 1963–71

Visitor to Faculty of Econ., Cambridge Univ., Michaelmas Term, 1962

Director, Northwestern Univ. Economic Survey of Liberia, 1961–62

Chairman, Dept. of Econ., Northwestern Univ., 1958–64

Assoc. Prof. of Econ., Northwestern Univ., 1957–62

Visiting Prof. of Econ., Univ. of the Punjab, Lahore, West Pakistan 1954–56

Asst. Prof. of Econ., Wash. State Univ., 1952–57

Instructor in Econ., Wash. State Univ., 1948–49

*Miscellaneous*

Managing Editor, *Economic Inquiry*, 1973 to present

Executive Committee, American Econ. Assn., 1978–81

American Consulting Editor, Penguin Books, 1966 to present

John Simon Guggenheim Memorial Foundation Fellowship, 1965–66

Editorial Board, *American Economic Review*, 1963–66

Ford Foundation Faculty Research Fellowship, 1960–61

Chairman, Oxford-London-Cambridge Joint Economic Seminars, 1950–52

Nuffield College Studentship, 1950–52

Rhodes Scholarship, 1949–52

Honorary Fellow, Brasenose College, Oxford, 1978–

*Personal Data*

Date of Birth: Feb. 13, 1926; Married, 6 children

Office: Dept. of Economics, UCLA, Los Angeles, Calif. 90024 (213–825–4422)

Home: 3136 Barry Ave., Los Angeles, Calif. 90066 (213–390–3225)

Military Service: U.S. Army, 1943–46, final rank of Warrant Officer (JG)

II. *Publications*

A. *Books*

*Introduction to Mathematical Economics* (with D. W. Bushaw), Richard D. Irwin, Inc., Homewood, Ill., 1957.

*Intermediate Economic Analysis* (with J. F. Due), Richard D. Irwin, Inc., 4th edition, 1961; 5th edition, 1966.

*Puerto Rico Shipping and the U.S. Maritime Laws*, Transportation Center, Northwestern University (with John Harris), 1965.

*Growth Without Development, An Economic Survey of Liberia* (with G. Dalton, A. Walters and M. Harwitz), Northwestern University Press, Evanston, Ill., 1966.

*Monetary Theory* (editor), Penguin Books, Ltd., London, 1969, (Italian translation, *La Teoria Monetaria*, Franco Angeli, ed., Milan, 1972).

*Microeconomics* (with J. F. Due), Richard D. Irwin, 1972 (Spanish translation, *Biblioteca Technos de Ciencias Economicas*, Madrid, 1978.

B. *Articles*

"Professor Duesenberry and Traditional Theory," *Review of Economic Studies*, Vol. XX, 1952–53, pp. 165–178.

"An Investigation into the Dynamics of Investment," *American Economic Review*, March, 1954, pp. 64–81.

"Productivity, Thrift and the Rate of Interest," *Economic Journal*, March, 1954, pp. 107–15.

"Price Determination in a Stock-Flow Economy" (with D. W. Bushaw) *Econometrica*, July, 1954, pp. 328–343.

"Competition, Monopoly, and the Theory of Price," *Pakistan Economic Journal*, September, 1955, pp. 219–226.

"Some Theory of an Ignorant Monopolist," *Economic Journal*, December, 1959, pp. 705–16.

"Keynes and the Classics: A Dynamical Perspective," *Quarterly Journal of Economics*, May, 1960, pp. 318–323.

"On the Invariance of the Demand for Cash and Other Assets" (with M. L. Burstein), *Review of Economic Studies*, October, 1960, pp. 32–36.

"Mathematics and Economics: The Contemporary Prospect," *Quarterly Review of Economics and Business*, May, 1961, pp. 37–45.

"Statistics and Development Policy Decisions" (with A. Walters and G. Dalton), *Development Research Review*, July, 1962, pp. 65–74.

"Die Keynesianische Gegenrevolution: eine theoretische Kritik," *Schweizerische Zeitschrift*, Heft 1, 1963, pp. 8–31.

"Classical Monetary Theory Revisited," *Economica*, May, 1963, pp. 165–70.

"Permanent Income and Transitory Balances: Hahn's Paradox," *Oxford Economic Papers*, July, pp. 177–90.

"Monetary History and Positive Economics," (review article), *Journal of Economic History*, September, 1964, pp. 364–80 (reprinted in Gibson & Kaufman, *Monetary Economics*, McGraw-Hill, 1971, pp. 22–23).

"The Keynesian Counterrevolution: A Theoretical Appraisal," *The Theory of Interest Rates* (Hahn & Brechling, eds.), The MacMillan Co., London, 1965, pp. 103–125 (reprinted in Surrey, *Macroeconomic Themes*, OUP, 1976, pp. 400–420; also in *La Nueva Teoria Monetaria*, Saltes, ed., Madrid, 1978, pp. 11–57).

"Effective Control through Coherent Decentralization with Preemptive Goals," *Econometrica* (with Charnes and Kortanek), April, 1967, pp. 294–320.

"A Reconsideration of the Microfoundations of Monetary Theory," *Western Economic Journal*, December, 1967, pp. 1–8.

"The Present State of International Liquidity Theory" (with R. G. Lipsey), *American Economic Review*, May, 1968, pp. 586–95.

"Stock-Flow Analysis," *International Encyclopedia of the Social Sciences*, 1968, pp. 273–77.

"Income, Wealth, and the Theory of Consumption," (with M. B. Johnson) *Essays in Honour of Sir John Hicks*, Edinburgh University Press, 1968, pp. 45–96 (reprinted in Surrey, *Macroeconomic Themes*, OUP, 1976, pp. 101–115).

"Conditions for African Economic Progress," Melville J. Herskovitz Memorial Lecture, University of Edingurgh, Centre for African Studies, 1968 (14 pp.).

"What Traditional Monetary Theory Really Wasn't," *Canadian Journal of Economics*, Vol. II, May, 1969, pp. 199–202.

"Is There an Optimal Money Supply?" *Journal of Finance*, XXV, No. 2, May, 1970, pp. 425–433 (reprinted in *Frontiers of Quantitative Economics*, M. Intrilligator, ed., N. Holland (1970).

"Theoretical Foundations of Monetary Policy," *Monetary Theory and Monetary Policy in the 1970's*, Clayton et al., eds. (London: Oxford Press, 1971), pp. 15–28.

"The Ideas of Economists," *Monash Lecture, 1972*, Monash University, Clayton, Victoria, 1973, 23 pp.

"Snarks, Quarks and Other Fictions: The Role of Formal Theory in Economic History," *Business Enterprise & Economic Change*, L.P. Cain and P.J. Uselding, eds., (Kent State University Press, 1973), pp. 3–14.

"Say's Principle: What It Means and Doesn't Mean," (with Axel Leijonhufvud), *Intermountain Econ. Review*, Fall, 1973, pp. 1–16.

"Reflections on Science and Economics," *Intermountain Econ. Review*, Spring, 1974, pp. 1–12.

"The Coordination of Economic Activities: A Keynesian Perspective," *American Economic Review* (Proc.), *65*, May, 1975, pp. 182–188.

"Reflections on the Keynesian Perplex," *Zeitschrift für Nationalökonomie*, *35*, July, 1975, pp. 1–24.

"A Reconsideration of the Theory of Inflation," *Resource Allocation and Economic Policy*, M. Allingham and M. L. Burstein, eds., London, Macmillan, 1976, pp. 14–25.

"The Anatomy of Monetary Theory," *American Economic Review* (Proc.), *67*, May, 1977, pp. 206–12.

"The Transactions Theory of the Demand for Money: A Reconsideration" (with Peter W. Howitt), *Journal of Political Economy*, June, 1978, pp. 449–466.

"The Genesis and Control of Inflation," *The Stability of Contemporary Economic Systems*, Oldrich Kyn and Wolfram Schrettl, eds., Germany, Vandenhoeck & Ruprecht, 1979.

## C. Notes and Comments

"Mr. Graaff's Producer-Consumption Theory: A Restatement and Correction," *Review of Economic Studies*, Vol. XX, 1952–53, pp. 84–5.

"The Analogy Between Ordinary and Relative Preference Analysis," *Review of Economics and Statistics*, November, 1953, pp. 353–4.

"Stock and Flow Quantities," *Economica*, August, 1959, pp. 251–2.

"Business Investment and the Theory of Price," *Proceedings of the Western Economic Association*, 1953, pp. 22–4.

"Oligopoly Theory: A Dynamical Approach," *Proceedings of the Western Economic Association*, 1959, pp. 16–19.

"Causal Systems and Stability," *Econometrica*, Vol. 33, No. 3 (July, 1965), pp. 241–2.

"Comment: The Optimal Growth Rate of Money," *Journal of Political Economy*, Vol. 76, No. 4, Part II, July/August, 1968, pp. 876–880.

"Foundations of Money Illusion in a Neo-classical Micro-Monetary Model: Comment," (with J. G. Riley), *American Economic Review, 66*, March, 1976, pp. 184–5.

"Marshall on Deposit Multipliers," *Economic Inquiry, 13*, June, 1975, p. 252.

## D. Book Reviews

"Introduction to Mathematical Analysis, by Daus and Whyburn," *Econometrica*, October, 1959, pp. 751–61.

"Problems and Practices of Development Banks, by S. Boskey," *Journal of Political Economy*, June, 1961, p. 313.

"Economic Development of Libya, International Banks for Reconstruction and Development," *Journal of Political Economy*, October 1961, p. 521.

"The Theory of Capital," *Southern Economic Journal*, July, 1962, pp. 44–5.

"Exercises in Economic Analysis, by Joan Robinson," *American Economic Review*, September, 1961, pp. 701–2.

"Monetary History and Positive Economics," see item B14, above.

"Asset Prices in Economic Analysis, by Samuel B. Chase, Jr.," *Annals of the American Academy of Political and Social Science*, 1964.

"Macroeconomics and Programming, by K. K. Kurihara," *American Economic Review*, September, 1965, p. 889.

"Measuring Benefits of Government Investments, edited by Robert Dorfman," *Annals of the American Academy of Political and Social Science*, November, 1965, p. 178.

"Foundations of Money and Banking," by Pesek and Saving, *Economica*, XXXVI, No. 141 (February 1969), pp. 84–8.

"Forecasting and Recognizing Business Cycle Turning Points, by Fels and Hinshaw," *Annals of the American Academy of Political and Social Science*, January, 1969, pp. 207–8.

"Critical Essays in Monetary Theory, by Sir John Hicks," *Journal of Political Economy*, May, 1970.

"The Theory of Imperfect Competition: A Radical Reconstruction, by Donald Dewey," *Journal of Economic Literature*, Dec. 1970, pp. 1212–1213.

"Money and Markets: A Monetarist View," by Beryl W. Sprinkel, *Economica*, August, 1972 (Vol. XXXIX, No. 155), p. 340.

"The Obscurantist Approach to Economics: Shackle on Keynes," *Eastern Economic Journal*, 2, Jan., 1975, pp. 99–101.

E. *Miscellaneous*

"Some Views on University Education in Pakistan," *Al-Iqtisad*, Hailey College of Commerce, Lahore, Pakistan, June, 1955, pp. 1–6.

"The Future of Banking in Pakistan," *Al-Iqtisad*, March, 1956, pp. 5–10.

"On the Microdynamics of Price Formation in n-Seller Markets," abstract of paper delivered at 1958 meetings of Econometric Society, *Econometrica*, April, 1959, pp. 312–313.

"Inductive Inference and Business Behavior," abstract of paper delivered at 1959 meetings of Econometric Society, *Econometrica*, July, 1960, pp. 685–6.

"A Study of Elementary Learning and Response Mechanisms in Dynamical Monopoly Models," *Office of Naval Research, Research Memorandum No. 12*, Northwestern University Technological Institute, December, 1958.

Foreword to Sir John Hicks' *The Crisis in Keynesian Economics* (New York: Basic Books, Inc. 1974).

Foreword to *The Political Economy of Policy-Making*, Dooley, Kaufman and Lombra, eds., (Beverly Hills, Sage Publications, 1979).

## BIO–BIBLIOGRAPHY

DATE: December 12, 1977

NAME: J. Fred Weston

UCLA OFFICE: Graduate School of Management, Room 6292

CAMPUS PHONE: 825–2200 or 825–2508 or 479–0136

HOME ADDRESS: 258 Tavistock Avenue, Los Angeles, 90049

HOME PHONE: 472–5110

SPOUSE'S NAME: June

BIRTHDATE: February 6, 1916

BIRTHPLACE: Fort Wayne, Indiana

DEGREES:

A.B. 1937 University of Chicago, Political Science

M.B.A. 1943 University of Chicago, Business Economics

Ph.D. 1948 University of Chicago, Finance

WORK EXPERIENCE:

1937–39 General Electric Company, Management Trainee

1941–43 Teaching Fellow, University of Chicago

1943–45 U.S. Army, Finance Department, Honorable Discharge as Senior Warrant Officer

1945–46 Economic Consultant, President of the American Bankers Association

1947–49 Instructor and Assistant Professor, University of Chicago

1949– Consultant to two or three firms per year

UCLA FACULTY APPOINTMENT:

Lecturer (Assistant Professor Level), 7/1/49

Professor, O/S, (above scale), 7/1/69

TEACHING:

a) Courses Taught in GSM:

BA 100 Business Economics (formerly BA 101), 1052–53

Mgt 130 Business Finance, 1955–

BA 131 Credit Management, 1950–55

BA 132 Money and Banking, 1950–53 and 1955–

Mgt 133 Investments, Principles and Policies, 1955–

Mgt 197A Special Topics

Mgt 200 Managerial Economics, 1955–

Mgt 202A Economic Theories of Business Behavior: Marginal, Managerial and Behavioral, 1972–

Mgt 202B Principles of Industrial Organization, 1972–

Mgt 202C Empirical Studies in Industrial Organization, 1972–

Mgt 202D The Organization of Industry and Business Policy, 1972–

Mgt 230A Money and Capital Markets (formerly BA 230), 1955–

BA 231 Business Finance—Theory and Policies, 1950–53

Mgt 231A Business Financial Policies (formerly BA 231), 1954–

Mgt 231B Business Financial Theory (formerly BA 231), 1953–

Mgt 231C Theory of Finance

Mgt 233A International Business Finance, 1972–

Mgt 297 Doctoral Research

b) Teaching Performed within the University in Addition to Regular Appointments:

1. XL 100 Business Economics, 1950–51
2. XL 115 Business Statistics, 1950–53
3. Executive Program, 1955–

4. UCLA Forecasting Conference for Executives Programs and Alumni, December 4, 1969.

5. "Corporate Strategies and Goals—A Composite Case Study Approach," UCLA Conference on Mergers and Acquisitions, March 10, 1970.

6. "The Economics of Environment Improvement," UCLA Student Groups, April 1970.

7. "Financial Trends and their Implications for Management," UCLA Executive Program Association, Back-to-Campus, April 2, 1970.

8. "Macroeconomic Models for Analyzing the Effects of the War in Southeast Asia," and "Preliminary Estimates of the Cost of the War in Southeast Asia," Student Groups, UCLA, April and May 1970.

9. "How Can Aerospace Companies Adapt to the New Environment," Executive Program Association, Discussion, October 28, 1970.

10. "Economic Factors in Environmental Improvement," Lecture CED 142A Class, December 1, 1970.

11. "Summary of Economic Outlook for 1971," Executive Program Association, December 8, 1970.

c) Outside Teaching Activities:

1. Instructor and Assistant Professor, University of Chicago, 1946–49. Taught money and banking, business economics, business finance, and risk and risk-bearing.

2. Distinguished Lecturer in Business Economics, "The Influence of Risk on Profits," "Economic Effects of Mergers," "Empirical Studies on the Causes of Concentration," and "The Economic Consequences of Concentration," University of Utah, May 4–5 and May 17–18, 1972.

CHAIRMANSHIPS OF DOCTORAL COMMITTEES:

a) Degrees Granted and Current Status:

1. Robert Hungate, 1961, Dean, School of Business, San Diego State University, San Diego, California.

2. Russell Nelson, 1962, Professor of Finance, School of Business, University of Minnesota, Minneapolis, Minnesota.

3. Paul Harmon, 1963, Professor of Management, Utah State University, Salt Lake City, Utah.

4. Anelise Mosich, 1963, Professor of Accounting, School of Commerce, University of Southern California.

5. Robert McKenzie, 1965, Associate Professor of Finance, School of Commerce, New York University, at time of death, 1967.

6. Bart Sorge, 1965, Associate Professor of Finance, School of Commerce, University of Southern California.

7. Joseph Buchwald, 1965, Professor of Accounting, San Fernando Valley State College.

8. Guilford Babcock, 1965, Professor of Finance, Graduate School of Business, University of California, Berkeley, California.

9. Earl Beecher, 1965, Associate Professor of Finance, Long Beach State College, Long Beach, California.

10. James Bray, 1967, Assistant Professor of Finance, University of British Columbia; Visiting Assistant Professor of Finance, University of California, Berkeley, 1967–68.

11. Manek Gupta, 1967, Associate Professor of Finance, Pennsylvania State University, College Station, Pennsylvania.

12. Craig Johnson, 1968, Assistant Professor of Finance, Columbia University, New York City.

13. Prakash Lohani, 1968, Government Position, Nepal.

14. Richardson Pettit, 1969, Associate Professor, Purdue University.

15. James M. Warren, 1969, Assistant Professor, University of California, Los Angeles, California.

16. Clement G. Krouse, 1969, Associate Professor, University of California, Los Angeles, California.

17. George N. Engler, 1970, Assistant Professor, University of Southern California.

18. Michael F. Dunn, 1971, Professor, San Fernando Valley State College.

19. Surendra K. Mansinghka, 1971, Assistant Professor, University of California, Riverside.

20. Steven Howard Lustgarten, 1971, Associate Professor, City College of New York.

21. James E. McCourt, 1971, Private Consultant.

22. Mark Edward Rubinstein, 1971, Assistant Professor of Finance, University of California, Berkeley, California.

23. Ronald Edward Shrieves, 1971, Assistant Professor of Business Economics and Finance, University of Tennessee.

24. Jerome B. Baesel, 1972, Assistant Professor of Business Economics and Finance, York University, Ontario, Canada.

25. Alfred Gregory Buckman, 1972, Assistant Professor of Accounting, University of California, Berkeley, California.

26. Nathan Hasson, 1975, Assistant Professor, University of Haifa, Haifa, Israel.

27. Patrick Smith, 1976, Catholic University, Washington, D.C.

28. Robert Trout, 1978, Consulting Firm

29. Edwin Eckard, 1977, General Motors Corp.

30. Richard L. Smith, 1979, Case Western Reserve University

b) Students Advanced to Candidacy:

1. Wayne Lieu, Spring 1973

c) Guidance Committees: Three to five per year, nine since 1969.

CHAIRMANSHIPS OF MASTER'S THESIS COMMITTEES:

None

MEMBERSHIP ON DOCTORAL AND MASTER'S THESIS COMMITTEES:

Doctoral:

1. Larry Y. Dann

2. Harry Charles DeAngelo
3. David Glasner
4. G. Kroon
5. Stanley Jayson Liebowitz
6. Stephen Margolis
7. Andrew James McLaughlin
8. Thomas Thayer Nagle
9. Edward M. Rice
10. James William Henry Watson

Masters:

1. Robert Vernon Bowden
2. Kwang Suon Chung

## COMMITTEE SERVICE:

a) Committees of the Academic Senate:

1. University Extension, Chairman, 1955–58.
2. Graduate Council, 1960–62.
3. Distinguished Teaching Committee, 1971–72. Chairman, 1972–73.

b) Administrative Committees: None

c) College, Departmental or Other University Committees:

1. Advisory Committee of Vice-Chairman, 1965–66.
2. Executive Committee, 1965–68.
3. Executive Program Advisory Committee, 1964–70.
4. Planning and Development Committee, 1966–67.
5. Research Committee, 1966–67.
6. GSM Ad Hoc Promotion Committees; 1–2 per year, 1970–77.
7. Apprentice Personnel Committee, GSM, 1970–71.
8. Faculty Welfare and Development Committee, 1970–71.
9. Medical School, Computer Facility, 1970–
10. Advisor to Mardi Gras, 1972–74.
11. Resource Allocation Committee, 1974– Chairman, 1974–
12. Health Sciences Computer Facility Advisory Committee, 1972–

d) Other Committees: None

## SPECIAL APPOINTMENTS:

a) Administrative Posts Held, Department Officers, etc.

1. Business Economics, Vice-Chairman, 1958–62.
2. Finance, Vice-Chairman, 1963–65.
3. Vice-Chairman of Business Economics, Finance, Insurance, Real Estate, Urban Land Economics, 1966–67.
4. Assistant Dean for Student Affairs, 1952–53.
5. Associate Dean, 1964.
6. Acting Chairman of the Department of Business Administration, 1954–55.
7. Director of Research Program in Competition and Business Policy, 1969–
8. Director, Study Center on Finance and Business Economics, 1971–

## PROFESSIONAL ACTIVITIES:

a) Consultative or Similar Service to Civic, State or National Governmental Agencies:

1. Testimony before Subcommittee on Monopoly of the Senate Judiciary Committee, 1953, 1962, 1965, 1973, 1975.
2. Testimony before Joint Economic Committee of Congress, 1962, 1965, 1967 and 1974.
3. Consultations with Small Business Administration, 1967–69.
4. Testimony before Committee on Product Safety, 1970.
5. Advisor on Ph.D. programs to University of Utah and Texas Christian University, 1970–71.
6. Testimony before Special Committee on Bankruptcy, 1971.
7. Testimony to the Price Commission, 1972.
8. Chairman, Advisory Committee to the Legislature of the State of California on "Noise Pollution," 1971–73.
9. Reviewer of annual program of plans, National Science Foundation, Office of National R & D Assessments, 1973–76.

10. Consultant, General Accounting Office, U.S. Government, 1976–

b) Other Consultative or Professional Activity:

1. Council of Reserve Bank Presidents, 1958–59.
2. Committee for Economic Development, 1959–60.
3. National Bureau of Economic Research, 1960–62.
4. Commission on Money and Credit, 1960–62.
5. Ford Foundation, Committee for award of Faculty Fellowship Grants, 1959, 1964, 1966.
6. Ford Foundation, Committee for award of the Ph.D. Dissertation Grants, 1963, 1964, 1965, 1966.
7. Sloan Foundation, 1966–67.
8. Reviewer, Ford Foundation Energy Policy Project, 1973–74.

c) Participation on Public Lectures or Forums:

1. Lectures to community or business groups, average 6–7 per year, 1955–69.
2. Special lectures on invitation to other universities, average about two each year, 1962–69.
3. Lectures to University of California Executive Program Alumni Group, average 1.5 per year, 1964–68.
4. "Vertical Integration in the Telecommunications Industry," Stanford University, July 8, 1969.
5. "Financial Planning in Large Organizations," presented to a meeting of the Institute of the World Economy, USSR, Moscow, July 28, 1969.
6. "Financial Planning and Control to Improve Management Performance," to Japan Management Association, August 11, 1969.
7. "International Economic and Financial Development," lectures to Conference of American Dairy Association, Phoenix, Arizona, August 19, 1969.

8. "Evaluating the Outlook for Key Areas of the Economy," Credit Managers' Association of Southern California, September 15, 1969.
9. "A Review of the NABE Forecasts for 1970," UCLA Forecasting Session, September 19, 1969.
10. Paper presented on "Public Policy Toward Bank Mergers," to Federal Reserve Bank of Chicago Conference on Banking Markets and Structure, October 13 and 14, 1969.
11. "Financial Planning and Control," New York University, November 1, 1969.
12. "Financial Management," Instituto de Administracion de las Empresas, Mexico City, November 18–20, 1969.
13. "A Summary View," UCLA Forecasting Conference, December 2, 1969.
14. UCLA Forecasting Conference for Executive Programs and Alumni, December 4, 1969.
15. "Role of Mergers in Planning Business Growth," Presidents' Association, Boca Raton, Florida, December 10, 1969.
16. "Economic Efficiency Evaluation of Conglomerate Firms," Subcommittee on Antitrust of the Senate Judiciary Committee, January 20, 1970.
17. "Economic Aspects of Consumer Product Safety," National Commission on Product Safety, March 4, 1970.

 Reprinted in *Business and Society References and Cases*, Steiner, G.A. (Ed.).
18. "Changing Environments and New Concepts of Firms and Markets," National Industrial Conference Board, Antitrust Conference, March 6, 1970.
19. "The Industrial Economics Background of the Penn Central Bankruptcy," American Finance Association, December 28, 1970. (Also see No. 45 under Professional Journal Articles Published).
20. "New Developments in Acquiring, Merging and Selling Companies,"

Advanced Management Research Conference, April 31, 1970.

21. "Fundamental Trends in the Financial Environment Affecting Credit Management," National Institute of Credit, October 19, 1970.

22. "Conglomerate Performance," Research Program in Competition and Business Policy, Graduate School of Business Administration, UCLA, November 5, 1970.

23. "CPM in the Measurement of Business Risk for Public Utility Regulation," Michigan State University, Conference on Public Utility Economics, February 27, 1971.

24. "Aspects of Consumer Bankruptcy," Commission on the Bankruptcy Laws of the United States, August 23, 1971.

25. Eighth Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, October 14–15, 1971.

26. "Forecast Summary," Forecast '72, UCLA, December 8, 1971.

27. "Economic Trends and their Implications for Credit Managers," The National Institute of Credit, January 12, 1972.

28. "Multinational Corporations," "Conglomerate Firms in Perspective," and "Conglomerate Performance Measured by the Capital Asset Pricing Model," Mississippi State University, March 13–14, 1972.

29. "The Bases of Regulation," Western Conference of Public Utility Commissioners, March 20–21, 1972.

30. "The Influence of Risk on Profits," "Economic Effects of Mergers," "Empirical Studies on the Causes of Concentration," and "The Economic Consequences of Concentration," Distinguished lectures in Business Economics, University of Utah, May 4–5, and May 17–18, 1972.

31. "International Outlook," International Institute of Credit, January 18, 1974.

32. "Current Trends in Anti-Trust Policy," presentation to the UCLA Conference on "Business in a Changing Environment," August 13, 1974.

33. "Pricing in Business—Theory & Practice," sponsored by the Alcoa Foundation, UCLA, August 14, 1974.

34. Speaker, "The Economic Performance of Large Firms," Conference on Changing Business—Society Relationships, UCLA, August 1974.

35. Discussant for presentation, "Peak Load Pricing Subject to Regulatory constraint," by David McNicol, Public Utilities: Economics and Finance Seminar, AT&T Seminar, UCLA, August 18–23, 1974.

36. "An Anti-Inflation Program," Joint Economic Committee, U.S. Congress, September 4, 1974.

37. "Inflation, Restrictive Practices, and Large Corporations," California Conference on Inflation, October 23, 1974.

38. "The Outlook for the Financial Markets," National Institute of Credit, January 15, 1975.

39. "Appraisal of Different Acquisition Patterns," Antitrust Conference, The Conference Board, New York, March 1975.

40. Participant in Council on Wage and Price Stability Conference on "Concentration, Administered Prices, and Inflation," Washington, D.C., April 14, 1975.

41. "Prices and Profits in Relation to Industry Structure," Association of General Counsel, Williamsburg, Virginia, May 12, 1975.

42. "Inflation and Big Business," Town Hall of California Meeting, Los Angeles, California, May 20, 1975.

43. "Current Issues in the Government's Anti-Trust Policy," The Changing Role of Business in Society Conference, UCLA, July 1975.

44. Conferee, "Diversification, Vertical Integration and Mergers," Public Utilities: Economics and Finance Seminar, UCLA, August 13, 1975.

45. Discussant, Antitrust Seminar, American Telephone and Telegraph Company, Western Electric Corporate Education Center, Princeton, New Jersey, October 9–10, 1975.

46. Chairman, "Evaluation of Capital Investment Decisions," Financial Management Association, Kansas City, Missouri, October 17, 1975.

47. "Are MNC's Using Their Market Power to Overprice?" National Conference on Multinational Corporations for Corporate Leaders, sponsored by the National Chamber Foundation, Washington, D.C., November 25–26, 1975.

48. Pharmaceutical Industry Conference at American University, December 15–16, 1975.

49. "The Economic Outlook," Credit Managers' Association of Southern California, Roger Young Auditorium, Los Angeles, California, January 19, 1976.

50. Presentation to the Federal Trade Commission, "Mergers and Economies of Scale," Los Angeles, California, March 11, 1976.

51. "The Managerial Finance Theory Course," San Jose, California, March 26, 1976.

52. "The FTC LOB Program," PMM Partner Development Program, Coto de Caza, July 1976.

d) Papers Presented at Professional Societies:

1. Presentations to meetings of professional associations, average one every two years, 1960–69.

2. "Pricing Policy of Large Corporations," Western Economic Association, August 27, 1970.

3. "Discussion of Vertical and Conglomerate Aspects of Market Imperfection," American Economic Association, December 27, 1970.

4. "Merger and Diversification Trends," National Association of Business Economists, September 19, 1969.

5. "The Industrial Economics Background of the Penn Central Bankruptcy," American Finance Association, December 1970.

6. "Current Trends in Financial Theory and Practice" Southwestern Finance Association Meetings, March 18, 1974.

7. "Trends in Financial Markets," Western Finance Association, June 16, 1974.

8. "An Econometric Model of Industrial Organization," Western Economic Association, June 16, 1974.

9. "The Content of the Basic Finance Course," Western Finance Association, June 28, 1975.

10. "Pricing and Management Science," National ORSA/TIMS Joint Meeting, Las Vegas, Nevada, November 19, 1975.

11. Discussant, "Mergers, Regulated Firms," American Finance Association Meeting, Dallas, Texas, December 27–30, 1975.

12. Discussant, Western Economic Association Annual Conference, San Francisco, California, June 24–27, 1976.

e) Service to the Staff or Editorial Board of Scholarly Journals or Other Publications:

1. *Journal of Finance*, Associate Editor, 1948–55.

2. *Financial Analysis Journal*, Board of Editors, 1965–70.

3. *Business Economics*, Board of Editors, 1965–

4. *Western Economic Journal*, Board of Editors, 1963–

5. *Journal of Financial and Quantitative Analysis*, Board of Editors, 1969–

6. *Journal of Business Research*, Board of Editors, 1973–

7. *Journal of Economics and Business*, Associate Editor, 1975–

8. Western Finance Association's Nominations Committee, Member, 1976.

9. *Journal of Corporate Accounting and Finance*, Advisory Board, 1977–

f) Membership in Professional Associations and Scholarly Societies:
1. Phi Beta Kappa, 1937–
 Treasurer, 1973–
2. American Finance Association, 1942–
 Board of Directors, 1961–62
 President, 1966
 Advisory Board, 1967–71
3. American Economic Association, 1943–
 Advisory Committee to the U.S. Census,
 Washington, D.C., 1973–75.
4. Western Economic Association, 1949–
 President, 1962
5. Econometric Society, 1950–
6. Royal Economic Society, 1955–
7. Financial Analysts Society, 1960–
8. American Statistical Association, 1960–

g) Community Service Activities:
1. Lectures to community groups, average 2 to 3 per year.
2. Educational Director, Credit Managers Association of Southern California, 1958–
3. "The Campaign for Corporate Responsibility," KTLA TV Channel 28, June 1970.

## AWARDS AND HONORS:
a) Commendations, Honors, Foreign Decorations, Honorary Degrees:
1. Cardinal O'Hara Memorial Lecturer, Notre Dame University, 1965.
2. Distinguished Lecture Series, University of Oklahoma, 1967.
3. Distinguished Lecture Series, Mississippi State University, 1972.
4. Distinguished Lecture Series, University of Utah, 1972.
5. Distinguished Lecture Series, Wright State University, 1975.
6. Distinguished Lecture Series, Miami State University, 1975.
7. A runner up for GSM, Alumni Association's Outstanding Teaching Award, June 1975.
8. Nominee from GSM for Campus Teaching Award, 1977.
9. Winner, Campus Teaching Award, 1978.

b) Contracts, Grants, Fellowships:
1. Principal Investigator, Ford Foundation, Faculty Research Fellowship, 1961–62.
2. Principal Investigator, McKinsey Foundation Grant of $17,500 to study "Corporate Resource Allocation," 1965–68.
3. Principal Investigator, General Electric Company, $10,000 grant for study of "Public Policy Toward Mergers," 1967.
4. Principal Investigator, Research program in competition and business policy, 1970–

## RESEARCH IN PROGRESS:
1. The development of the large diversified corporation and its implications for the theory of the firm, 1972–
2. The Research Program in Competition and Business Policy is engaged in a large scale empirical effort to test theories of market behavior with new approaches, new data and new specifications of the models.
 Econometric Model of Industrial Organization
 Studies of Auto, Drug, Steel and Telecommunication Industries.

## OTHER RELEVANT INFORMATION:
None

## PUBLICATIONS:
a) Books Published:
1. Weston, J. F., *The Role of Mergers in the Growth of Large Firms*, Berkeley: University of California Press, (1953).
2. Weston, J. F. and Jacoby, N. H., *Procurement and Profit Renegotiation*, San Francisco: Wadsworth Publishing Company, Inc., (1960). Author of

**1126**

Chapters 1 and 12, co-author (with Jacoby, N. H.) of Chapter 9, "Profit Standards for Renegotiation."

3. Weston, J. F., *Managerial Finance*, New York: Holt, Rinehart and Winston, Inc., (1962).

Appendix to Chapter 22 ("Some Theoretical Aspects of Convertible Securities") reprinted in *Readings in Essentials of Managerial Finance*, Brigham, E. F., Ricks, R. B., (Eds.), New York: Holt, Rinehart and Winston, (1968).

Second Edition, New York: Holt, Rinehart and Winston, 1966.

Third Edition (with Eugene F. Brigham), New York: Holt, Rinehart and Winston, (1969).

Fourth Edition, (with Eugene F. Brigham), New York: Holt, Rinehart and Winston, Inc., (1972).

Fifth Edition, (with Eugene F. Brigham), New York: Holt, Rinehart and Winston, Inc., (1975).

4. Weston, J. F., *Defense-Space Market Research*, Cambridge, Mass.: The M.I.T. Press, (1964).

5. Weston, J. F., *Financial Management in the 1960's: New Challenges and Responsibilities*, New York: Holt, Rinehart and Winston, (1966).

6. Weston, J. F. and Woods, D.H., *Basic Financial Management*, Belmont, California: Wadsworth Publishing Co., (1967).

7. Weston, J. F. and Woods, D. H., *Theory of Finance, Readings*, Belmont, California: Wadsworth Publishing Company, (1967).

8. Weston, J. F. and Brigham, E. F., *Essentials of Managerial Finance*, New York: Holt, Rinehart and Winston, Inc., Second Edition, (1968), Third Edition, (1974).

9. Weston, J. F., and Brigham, E. F., *Study Guide for Essentials of Managerial Finance, Third Edition, Managerial Finance, Fourth Edition*, New York: Holt, Rinehart, and Winston, Inc., (1968, 1971, 1974).

10. Weston, J. F. and Peltzman, S., *Public Policy Toward Mergers*, Pacific Palisades, California: Goodyear Publishing Company, Inc., (1969).

11. Weston, J. F. and Sorge, B. W., *International Managerial Finance*, Homewood, Ill.: R. D. Irwin, Inc., (1972).

12. Weston, J. F. and Ornstein, S. I., *The Impact of Large Firms on the U.S. Economy*, Lexington, Mass.: D.C. Heath & Co. (1973).

13. Weston, J. F. and Brigham, E. F., *Administracion Financiera de Empresas*, Cedro, Mexico: Nueva Editorial Interamericana, S.A. de C.V., (1973).

14. Goldschmid, H. J., Mann, H. M., Weston, J. F., *Industrial Concentration: The New Learning*, Boston: Little Brown and Co., (1974). Also author with Lustgarten, S. H., of Chapter, "Concentration and Wage-Price Changes," 307–338.

15. Weston, J. F., (Ed.), *Large Corporations in a Changing Society*, New York: New York University Press, (1975).

16. Weston, J. F. and Goudzwaard, M. G. (Eds.), *Treasurer's Handbook*, Homewood, Illinois: Dow Jones-Irwin, (1976).

17. Weston, J. F., and Bart W. Sorge, *Guide to International Financial Management*, New York: McGraw-Hill Book Company, (1977).

b) Books Accepted for Publication:

1. Weston, J. F. and Goudzwaard, M. G., (Eds.), *Treasurer's Handbook*, Richard D. Irwin, Inc.

c) Chapters in Books:

1. Jacoby, N. H. and Weston, J. F., "Factors Influencing Managerial Decisions in Determining Forms of Business Financing: An Exploratory Study," in *Conference on Research in Business Finance*, National Bureau of Economic Research, 1952.

Reprinted in *Financial Management*, Corrigan, F. J. and Ward, H. A., (Eds.), Houghton Mifflin Co., (1963).

2. Jacoby, N. H. and Weston, J. F., "Financial Policies for Regularizing Business Investment," in Conference on Investment Regularization, National Bureau of Economic Research, (1954).

3. Weston, J. F., "Financial Provisions of the E.E.C.," 459–487 in *International Manual on the European Economic Community*, Junckerstoriff, H. K. (Ed.), St. Louis: St. Louis University Press, (1963).

4. Weston, J. F., "Analysis of the Technical Components of the Federal Credit Programs," Chapter 7, in *Federal Credit Programs* (Research Studies for the Commission on Money and Credit); Englewood Cliffs, New Jersey: Prentice-Hall, (1963).

5. Weston, J. F., "California's Future: Some Open Questions," Chapter 9, 55–68 in *California's Future Economic Growth*, Werner, Z. H. and Baisden, R. N., (Eds.), Berkeley: Diablo Press, (1965).

6. Weston, J. F., "The Determination of Share Exchange Ratios in Mergers," Chapter 6, in *The Corporate Merger*, Alberts, W. W. and Segall, J. E., (Eds.), Chicago: University of Chicago Press, (1966).

7. Weston, J. F., "Sources and Costs of Obtaining Funds," in *Profits in the Modern Economy*, Minneapolis, Minn.: University of Minnesota Press, (1967).

8. Weston, J. F., "Valuation of the Firm and Its Relation to Financial Management," Chapter 1, 10–33, in *Financial Research and Management Decisions,* Robichek, A. A. (Ed.), New York: John Wiley and Sons, Inc., (1967).

9. Weston, J. F., "Evaluating Company Performance," Chapter 7, in *Handbook of Business Administration*, Maynard, H. B., (Ed.), New York: McGraw-Hill, (1967).

10. Weston, J. F., "The Position of Small Business in the American Economy," Chapter 2, in *The Financing of Small Business*, Peffer, I. (Ed.), New York: Macmillan Co., (1967).

11. Weston, J. F., "Discussion of papers on Equity, Capital, Leverage and Taxes," 117–125 in *Rate of Return Under Regulation; New Directions and Perspectives*, Trebing, H. M., and Howard, R. H., (Eds.), East Lansing: Michigan State University, (1969).

12. Weston, J. F., "The Nature and Significance of Conglomerate Firms," *St. John's Law Review, 44*, 66–80, Special Edition, Brooklyn, N. Y., (1970).

13. Weston, J. F., "Changing Environments and New Concepts of Firms and Markets," 9–15 in *New Technologies, Competition, and Antitrust*, National Industrial Conference Board, Ninth Conference on Antitrust Issues in Today's Economy, (1970).

14. Weston, J. F., "Business Power Over Markets and Consumers—The Facts," and Economic Consequences of Industrial Concentration," chapters 20 and 21, *Contemporary Challenges in the Business—Society Relationship*, Steiner, G. A., (Ed.), Los Angeles, California, Graduate School of Management, (1972).

15. Weston, J. F., "Economic Aspects of Consumer Product Safety," 487–500 in *Issues in Business and Society*, Steiner, G. A. (Ed.), New York: Random House (1972).

16. Weston, J. F. and Dunn, M. F., "CAPM and the Measurement of Business Risk," 47–81 in *Risk and Regulated Firms*, Howard, R. H., (Ed.), Graduate School of Business Administration, Michigan State University (1973).

17. Weston, J. Fred, "Investment Decisions Using the Capital Asset Pricing Model," in *Financial Management*, by Clark, J. J., Clark, M. and Elgers, P., Boston, Mass.: Holbrook Press, 1976.

**1128**

18. Weston, J. Fred, "Do Multinational Corporations Have Market Power to Overprice?" in *The Case for the Multinational Corporation: Six Scholarly Views*, Madden, C. (Ed.), New York: Praeger Publishers, 1977, pp. 10–69.

19. Weston, J. Fred, "Comment: The Integrated Firm Under Regulatory Constraint," in *New Dimensions in Public Utility Pricing*, Trebing, H. M., (ed.), MSU Public Utilities Studies, Division of Research, Graduate School of Business Administration, Michigan State University, 1976, pp. 608–619:

d) Monographs:

1. Weston, J. F., *Economics of Competitive Bidding on New Issues of Corporate Securities*, Chicago: University of Chicago Press, 1942.

2. Weston, J. F., *The Scope and Methodology of Finance*, Englewood Cliffs, New Jersey: Prentice-Hall, Inc., 1966.

c) Professional Journal Articles Published:

1. Weston, J.F., "Profit as the Payment for Uncertainty-Bearing," *Journal of Business, 22,* 2, 106–118, (1949).

2. Weston, J.F., "Enterprise and Profit," *Journal of Business 22,* 3, 141–159, (1949).

3. Weston, J.F., "Consistency and Changing Price Levels," *Accounting Review, 24,* 4, 379–386, (1949).

4. Weston, J.F., "Some Theoretical Aspects of the Construction of Formula Timing Plans," *Journal of Business, 22,* 4, 249–270, (1949).

5. Weston, J.F., "Incidence and Effects of the Corporate Income Tax," *National Tax Journal, 2,* 4, 300–315, (1949).

6. Weston, J.F., "A Generalized Uncertainty Theory of Profit," *American Economic Review, 40,* 1, 40–60, (1950).

7. Weston, J.F., "Comment on the Lintner-Butters Analysis of the Effect of Mergers on Industrial Concentration, 1940–1947," *Review of Economics and Statistics, 33,* 1, 72–73, (1951).

8. Weston, J.F., "An Uncertainty Theory of Profit," (comments and rejoinder included), *American Economic Review, 41,* 1, 165–181, (1951).

9. Weston, J.F., "The Recent Merger Movement," *Journal of Business, 25,* 1, 30–38, (1952).

10. Weston, J.F., "Discussion: Investment and Economic Effects of Growth of Private Pension Plans," *Journal of Finance,* 281–284, (1952).

11. Jacoby, N.H. and Weston, J.F., "Profit Standards," *Quarterly Journal of Economics, 66,* 224–250, (1952).

12. Weston, J.F., "Revaluations of Fixed Assets," *Accounting Review, 28,* 4, 482–490, (1953).

 Reprinted in *Readings in Accounting Theory* Carl T. Devine (Ed.), Universitas Indonesia, (January 1963).

13. Weston, J.F., "The Profit Concept and Theory: A Restatement," *Journal of Political Economy,* (April 1954).

 Reprinted in *Readings in Microeconomics,* David R. Kamerschen (Ed.), World Publishing Co., (1967).

 Reprinted in *Readings in the Development of Economic Theory,* I. Rima (Ed.), Holt, Rinehart and Winston, (1970).

14. Weston, J.F., "Norms for Debt Levels," *Journal of Finance, 9,* 2, 124–135 (1954).

15. Weston, J.F., Karrenbrock, W.E., "Profit Determination in Renegotiation," *Controller,* 216–245 (1954).

16. Weston, J.F., "The Finance Function," *Journal of Finance, 9,* 3, 265–282 (1954).

17. Weston, J.F., Beranck, W., "Programming Investment Portfolio Construction," *Analysts Journal,* (1955).

18. Weston, J.F., "Toward Theories of Financial Policy," *Journal of Finance,* (1955).

19. Weston, J.F., "The Stock Market in Perspective," *Harvard Business Review*, 71–80 (1966).

20. Weston, J.F., "Financial Implications of Growth," *Controller*, 118–120 (1958).

21. Weston, J.F., "Forecasting Financial Requirements," *Accounting Review*, 427–440, (1958).

 Reprinted in *Elements of Financial Administration*, O'Donnel, J.L., Goldberg, M.S., (Eds.), Charles E. Merrill Books, Inc., (1962).

 Reprinted in *Administrative Control and Executive Action*, Lemke, B.C., Edwards, J.D., Charles E. Merrill Books, Inc., (1961).

22. Weston, J.F., Craig, R., "Understanding Lease Financing," *California Management Review, 2*, 2, 67–75, (1960).

23. Weston, J.F., "A Not-So-New Era in the Stock Market," *Financial Analysts Journal*, 57–64, (1960).

 Reprinted in *Readings in Financial Analysis and Investment Management*, Lerner, E.M., (Ed.), R.D. Irwin, Inc. (1963).

 Reprinted in *Readings in Investments*, Crary, H. and Lishan (Eds.).

24. Weston, J.F., "The Management of Corporate Capital: A Review Article," *Journal of Business, 34*, 2, 129–139, (1961).

25. Weston, J.F., "The Timing of Financial Policy," *The Controller, 29*, 12, 596–600 *ff.*, (1961).

26. Ansoff, H.I., Weston, J.F., "Merger Objectives and Organization Structure," *Quarterly Review of Economics and Business, 2*, 3, 49–58, (1962).

 Reprinted in *Management in Perspective*, Schlender, W.E., Scott, W.G., Filley, A.C., (Eds.), Houghton Mifflin and Company, (1965).

27. Weston, J.F., "Planning for Corporate Merger," *California Management Review*, 25–29, (1963).

 Reprinted in *Business Policy Readings and Commentaries*, Gross, A. and Gross, W., (Eds.), The Ronald Press Company, (1967).

 Reprinted in *Readings on Mergers*, Gross, A., (Ed.).

28. Weston, J.F., Jacoby, N.H., "Economic Problems of *In Lieu* Taxation of Banks," *National Tax Journal, 16*, 1, 1–10, (1963).

29. Weston, J.F., "The Measurement of Comparative Tax Burdens of Firms in Different Industries," *National Tax Journal, 16*, 3, 230–237, (1963).

30. Weston, J.F., "A Test of Cost of Capital Propositions," *The Southern Economics Journal, 30*, 2, 105–112, (1963).

 Reprinted in *Readings in Financial Management*, Mock, E.J., (Ed.), International Textbook Company, (1964).

 Reprinted in *Theory of Managerial Finance, Selected Readings*, Ball, R.E. and Melnyk, Z.L., (Eds.), Allyn and Bacon, Inc., (January 1967).

 Reprinted in *The Theory of Business Finance: A Book of Readings*, Archer, S.H. and D'Ambrosio, C.A., (Eds.), MacMillan Company, (1967).

31. Weston, J.F., and Reisman, A., "Teorias Del Dessarollo Economico y Estrategia de las Empresas," *Boletin de Estudios Economicos, 18*, 60, 621–637, (1963).

32. Weston, J.F. and Eiteman, D.K., "Economic Trends and Security Values—A Bleak or Bountiful Future for Investors?," in *Financial Analysts Journal*, (January-February 1965).

33. Weston, J.F., "Financial Analysis, Planning, and Control," *Financial Executive, 75*, 40–48, (1965).

 Reprinted in *Financial Decision-Making*, Mock, E.J. (Ed.), International Textbook Co., (1967).

34. Ricks, R.B. and Weston, J.F. "Land As a Growth Investment," *Financial Analysts Journal*, 1–10, (1966).

35. Reisman, A., Weston, J.F., and Buffa, E.S., "beitrag zu eintar Theorie der optimalen Finanzstruktur," *Zeit-*

▉▉▉▉▉▉▉▉▉▉ *schrift Fur Betreibswirtschaft,* Wiesbaden: Betriebswirtschaftlicher Verlag, Dr. Th. Gabler, 568–577 (1966).

36. Weston, J.F., "Comment on Cost of Capital Studies by Miller-Modigliani and by Lintner," in *Determinants of Investment Behavior,* Ferber, R. (Ed.), New York: Columbia University Press, (1967).

37. Weston, J.F., "The State of the Finance Field," *Journal of Finance, 22,* 4, 539–40 (1967).

38. Weston, J.F., "Antitrust Standards for 1975," *Nebraska Law Review, 46,* 3, 646–679, (1967).

39. Weston, J.F. and Sorge, B., "Export Insurance: Why the U.S. Lags," Columbia Journal of *World Business, 2,* 5, 67–76, (1967).

40. Weston, J.F., "Reply on Merger Valuation," *Journal of Finance, 23, 3,* 535–536, (1968).

41. Weston, J.F., "Comment on Professor Shepherd's Conglomerate Mergers in Perspective," *Antitrust Law and Economics Review, 2,* 1, 33–42, (1968).

42. Weston, J.F. and Hoskins, W.L., "Line of Commerce and Commercial Banking," *Southern California Law Review, 42,* 2, 225–244, (1969).

43. Weston, J.F., "Diversification and Merger Trends," *Business Economics, 5,* 1, 50–57 (1970).

44. Weston, J.F., "Mergers and Acquisitions in Business Planning," *Rivista internizionale di Science Economiche e Commerciali, 17,* 4, 309–320 (1976).

45. Weston, J.F., "The Industrial Economics Background of the Penn Central Bankruptcy," *The Journal of Finance, 26,* 2, 311–326 (1971). (Also see No. 19 under Participation on Public Lectures or Forums.)

46. Weston, J.F., "Responses to Market Imperfections—Decisions," *American Economic Review, 61,* 2, 125–127 (1971).

47. Weston, J.F., and Mansingnka, S.K., "Tests of the Efficiency Performance of Conglomerate Firms," *The Journal of Finance, 26,* 4, 919–936 (1971).

Reprinted in *Readings on Mergers and Takeovers,* Samuels, J.M., (Ed.), London: Paul Elek Books Ltd. (1972).

48. Weston, J.F., "Pricing Behavior of Large Firms," *Western Economic Journal, 10,* 1, 1–18 (1972).

49. Weston, J.F., "ROI Planning and Control," *Business Horizons, 15,* 4, 35–42 (1972).

Reprinted in *Budgeting for Profits,* Chandra, G. and Singhvi, S.S., (Eds.), Planning Executives Institute (1975).

50. Weston, J.F., Smith, K.V. and Shrieves, R.E., "Conglomerate Performance Using the Capital Asset Pricing Model," *The Review of Economics and Statistics, 54,* 4, 357–363 (1972).

51. Weston, J.F., "Implications of Recent Research for the Structural Approach to Oligopoly," *Antitrust Law Journal, 41,* 3, 623–634, (1972).

52. Adizes, I. and Weston, J.F., "Comparative Models of Social Responsibility, *Academy of Management Journal, 16,* 1, 112–128, (1973).

Reprinted in *Social Issues in Business,* 2nd Ed., Luthans, F. and Hodgetts, R.M., (Eds.), New York: Macmillan and Company (1975).

53. Ornstein, S.I., Weston, J.F., Intriligator, M.D., and Shrieves, R.E., "Determinants of Market Structure," *The Southern Economic Journal, 4,* 612–625 (1973).

54. Weston, J.F., "Conglomerate Firms in Perspective," *Intermountain Economic Review, 4,* 1, 1–13, (1973).

55. Weston, J.F. and Hoskins, W.L., "Geographic Aspects of Market Structure and Performance in Banking," *Journal of Business Research, 1,* 1, 31–42, (1973).

56. Weston, J.F., "Investment Decisions Using the Capital Asset Pricing Model," *Financial Management, 2,* 25–33, (1973).

57. Lebell, D., Schultz, K., and Weston, J.F., "Small-Scale Industries and Developing Countries," *California Management Review, 17,* 1, 3240 (1974).

58. Weston, J.F., Lustgarten, S., and Grottke, N., "The Administered Price Thesis Denied," *American Economic Review, 64,* 1, 232–234, (1974).

59. Weston, J.F., "New Themes in Finance," *The Journal of Finance, 29,* 237–244, (1974).

60. Weston, J.F., and Mansinghka, S.K., "Conglomerate Performance Measurement: Comment," *The Journal of Finance, 29,* 1011–1012 (1974).

61. Weston, J.F., "A Managerial Orientation in the First Finance Course," *Journal of Financial and Quantitative Analysis, 10,* 699–704 (1975).

62. Weston, J.F., and Edward M. Rice, "Value of the Firm Under Regulation: Mergers and Stockholder Returns, Discussion," *The Journal of Finance, 31,* 743–47 (1976).

63. Weston, J.F., "Asset Expansion Decisions in the Framework of the Capital Asset Pricing Model," *Bedrijfskunde. Tijdschrift voor Modern Management, 48,* 197–207 (1976/3).

64. Weston, J.F., and Rice, E.M., "Do Steel Producers Administer Prices?" *Challenge,* 19–24 (1976).

65. Weston, J.F., Smith, K.V., "Further Evaluation of Conglomerate Performance," *Journal of Business Research, 5,* 5–14 (1977).

f) Professional Journal Articles Accepted:

1. Weston, J.F., Lee, W.Y., "Cost of Capital for a Division: Note," *Journal of Finance,* forthcoming.

g) Professional Journal Articles Submitted:

1. Weston, J.F., Dann, L.Y., "A Framework for the Analysis of Leasing."

h) Conference Proceedings Published:

1. Weston, J.F., "Some Perspectives on Capital Theory," *Proceedings Issue of The American Economic Review, 41,* 2, 129–144, (1951).

2. Weston, J.F., "Criteria for Judging Mergers," *Proceedings of the Thirty-Second Annual Conference of the Western Economic Association,* 82–84, (1957).

3. Weston, J.F., "An Appraisal of Recent Contributions to the Theory of the Cost of Capital," *Proceedings of the Thirty-Fourth Annual Conference of the Western Economic Association,* (April 1959).

4. Weston, J.F., "The Good Financial Society," *Proceedings of the Thirty-Fifth Annual Conference of the Western Economic Association,* (August 1960).

5. Weston, J.F., "The Characteristics of Postwar Business Fluctuations," in *Effective Marketing Coordination, Proceedings of the Forty-fourth National Conference of the American Marketing Association,* 441–454, (1961).

6. Weston, J.F., "Influence of Stages of Development on Growth Rates," *Proceedings of the 1961 Meetings of the American Statistical Association,* 62–73, (1961).

7. Weston, J.F., "The Measurement of Cost of Capital," *Proceedings of the 1962 Summer Symposium of the American Society for Engineering Education,* Lesser, A. Jr. (Ed.), 80–90, (1962).

8. Weston, J.F., "Discussion of Papers on Capital Markets," *The 1963 Proceedings of the Business and Economic Statistics Section of the American Statistical Association,* 177–179, (1963).

9. Weston, J.F., "The Economic Performance of Large Firms," *Proceedings of the Conference on Changing Business-Society Relationships,* Stenner, G.A. (Ed.), Graduate School of Management, UCLA, Los Angeles, (1974).

10. Weston, J.F., "Comment: Regulatory Reform for the Deposit Financial Institutions—Retrospect and

 Prospects," *Journal of Financial and Quantitative Analysis, 1974 Proceedings,* 831–833, (November 1974).

i) Book Reviews:

1. Review of *Economic Mobilization for War,* a group of Brown University Economists, Chicago: Richard D. Irwin, Inc., in *The Journal of Business of the University of Chicago, 15,* pp. 234, (July, 1942).

2. Review of *Readings in the Theory of Income Distribution,* Selection Committee: Fellner, W. and Haley, B.E., Philadelphia: The Blakiston Company, in *The Journal of Business of the University of Chicago, 20,* 179–181, (July 1947).

3. Review of *The Regulation of the Security Market,* Atkins, W.E., Edwards, G.N. and Moulton, H.G., Washington: Brookings Institution, in *The Journal of Political Economy, 55,* 377–378, (August 1947).

4. Review of *Insurance,* Ackerman, S.B., New York: Ronald Press Company, the University of Chicago, in *The Journal of Business, 22,* 204–205, (July 1949).

5. Review of *Problem Manual in Corporation Finance,* Van Arsdell, P.M., New York: Ronald Press Company, in *Accounting Review, 25,* 478–479 (October 1950).

6. Review of *Cyclical Diversities in the Fortune of Industrial Corporations,* Hultgren, T., New York: National Bureau of Economic Research, in *Journal of American Statistical Association, 46,* 131–138 (1951).

7. Review or *Changing Concepts of Business Income—Report of Study Group on Business Income,* New York: MacMillan, in *American Economic Review, 42,* 662–665 (September 1952).

8. Review of *The Theory of Investment of the Firm,* Lutz, F. and V., Princeton: Princeton University Press, in *Journal of Business of the University of Chicago, 25,* 269–271 (October 1952).

9. Review of *Case Problems in Finance,* Hunt, P. and Williams, C.M., Homewood: Irwin, in *Accounting Review,* (January 1955).

10. Review of *The 20th Century Capitalist Revolution,* Berle, Adolph, A., Jr., in *Journal of Political Economy,* (February, 1956).

11. Review of *Common Stock Financing,* Stevenson, H.W., University of Michigan Press, in *Accounting Review,* 716–717 (October 1958).

12. Review of *The Scholastic Analysis of Usury,* Noonan, J.T., Jr., Harvard University Press, in *Journal of Finance, 14,* 1, (March 1969).

13. Review of *Railroad Equipment Financing,* Street, D.M., in *Journal of Finance, 15,* 1 (March 1960).

14. Review of *Financial Institutions* in *Journal of Finance, 16,* 3, 461–462 (September 1961).

15. Review of *Growth Yields on Common Stock,* Soldofsky, R., in *Accounting Review,* (July 1964).

16. Review of *California Banking in a Growing Economy,* Minsky, H., in *National Banking Review,* 586–590, (1966).

17. Review of *Insider Trading and the Stock Market,* Manne, N., in *George Washington Law Review,* 140–145, (1967).

18. Review of *The Corporate Economy,* Marris, R. and Wood, A., Cambridge, Mass.: Harvard University Press, in *The Journal of Finance, 27,* 1, 157–159 (March 1972).

19. Review of *Economic Concentration: Structure, Behavior and Public Policy,* Blair, J.M., in *Monthly Labor Review, 79,* (October 1972).

20. Review of the FTC Staff's *Economic Report on Conglomerate Merger Performance* in *The Bell Journal of Economics and Management Science, 4,* 2, 635–639 (1973).

21. Review of *Financial Control: A Systems Approach,* Wilson, R.M.S., McGraw-Hill Co., (UK), Ltd., Maid-

enhead, England, 1974, in *The Bankers Magazine, 158,* 5, (Summer 1975).

j) Reports: None

k) Working Papers:
1. Weston, J.F., Intriligator, M.D., and DeAngelo, H., "An Econometric Test of the Structure Conduct-Performance Paradigm in Industrial Organization."

l) Abstracts: None

OTHER CREATIVE ACTIVITY:

a) Video Tapes: (Written and Recorded)
1. Lectures on Finance Function, Financial Forecasting, Bankruptcy for Learning Centre Course in Managerial Finance.

b) Cases: None

c) Hearings: (Senate Hearings)
1. J. Fred Weston, "Conglomerate Firms and Economic Efficiency," presentation to U.S. Subcommittee on Antitrust and Monopoly, Senator Philip A. Hart, Chairman, Washington, D.C., January 28, 1970.
2. Hearings before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary United States Senate, 93rd Congress, S. 1167, March and May 1973.
3. "Anti-Inflation Program," *Hearings on Pricing by Concentrated Industries,* Joint Economic Committee, U.S. Government Printing Office, 13–30, September 4, 1974.
4. "Some Economic Statistics Related to the Prenotification Bill S. 409," *Hearings on Council on Wage and Price Stability Act Amendments of 1975,* Committee on Banking, Housing and Urban Affairs, United States Senate, Ninety-Fourth Congress, First Session, 317–333, March 7, 1975.
5. "Industrial Concentration and Stabilization Efforts," in *Oversight of Antitrust Enforcement,* Hearings before the Subcommittee on Antitrust and

Monopoly of the Committee on the Judiciary United States Senate, Ninety-Fifth Congress, First Session, 558–571, May 11, 1977.

d) Other:
1. "Finance Business," *Encyclopedia Britannica,* Fifteenth Edition, 298–302 (1974).

## JUDGMENT FOR DEFENDANTS AND AGAINST PLAINTIFF

Hauk, District Judge.

This action came on for trial before the Court, the Honorable A. Andrew Hauk, United States District Judge, presiding, on August 1, 1979, and the issues having been duly tried, and the Court having rendered and entered its Memorandum of Decision and Order of Judgment, constituting the Court's findings of fact and conclusions of law,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That defendant Kerkorian be, and he hereby is, dismissed from and out of the Complaint, First Amended Complaint, and each and every cause of action therein alleged or attempted to be alleged therein, for lack of jurisdiction.

2. That defendant Tracinda be, and it is hereby, dismissed from and out of the Complaint, First Amended Complaint and each and every cause of action alleged or attempted to be alleged therein, because said defendant Tracinda is exempted from Section 7 of the Clayton Act, 15 U.S.C. 18, by the first sentence of paragraph three thereof.

3. That plaintiff take nothing of or from defendants or either of them, and defendants have judgment against plaintiff on the merits.

4. That the Complaint, First Amended Complaint and each and every cause of action alleged or attempted to be alleged therein against defendants or either of them, be and the same are dismissed on the merits.

5. That defendants shall have and recover its and his respective costs of suit incurred herein.